846 F.2d 208
 Harry PLYLER, et al., (formerly Gary Wayne Nelson, et al.),
Plaintiffs- Appellees,
v.
Parker EVATT, Commissioner, South Carolina Department of
Corrections; Members of the South Carolina Board
of Corrections, Defendants-Appellants.
 No. 88-7511.
 United States Court of Appeals,
Fourth Circuit.
 Argued Feb. 3, 1988.
Decided April 27, 1988.
 
 T. Travis Medlock, Atty. Gen., Kenneth Paul Woodington, Sr. Asst. Atty. Gen., Columbia, S.C. (Larry C. Batson, Columbia, S.C., Legal Advisor, S.C. Dept. of Corrections on brief), for defendants-appellants.
 W. Gaston Fairey (Fairey & Parise, P.A., Columbia, S.C., Nat. Prison Project, American Civ. Liberties Union, Southern Prisoner's Defense Committee on brief), for plaintiffs-appellees.
 Before PHILLIPS and WILKINS, Circuit Judges, and HAYNSWORTH, Senior Circuit Judge.
 WILKINS, Circuit Judge:
 
 
 1
 The Commissioner of the South Carolina Department of Corrections and the members of the South Carolina Board of Corrections (Department of Corrections) appeal from the denial of a motion for modification of a consent decree regarding correctional facilities. The Department of Corrections also appeals from a recent court-ordered plan requiring early release of approximately 700 prisoners. We vacate the orders and remand for modification of the consent decree consistent with this opinion.
 
 I.
 
 2
 This action was initiated in 1982 when a class of inmates filed suit against the Department of Corrections under 42 U.S.C.A. Sec. 1983 (West 1981), complaining of overcrowded conditions in state prisons. The State of South Carolina, acting through the General Assembly, authorized negotiations, expressing intent "by legislation and appropriations to implement a reasonable settlement of the issues." H.Cong.Res. No. 3054, 1983, S.C. House J. 2837. The General Assembly approved a general agreement reached by the parties in 1984 and simultaneously appropriated funds for capital improvements. Appropriations Act, Act No. 512, Part III, Sec. IV, 1984 S.C. Acts 2176, 3107. A proposed settlement agreement was signed in January 1985 by then Commissioner William D. Leeke, all active members of the Board of Corrections, a representative of the Attorney General, counsel for the inmates, and 26 representatives of the inmate class. The Department of Corrections began immediate implementation of the settlement agreement. Subsequently, the district court orally approved the agreement in November 1985 and by written consent decree in March 1986. Among many other things, the consent decree placed certain requirements on new construction and renovation. It provided that new cells housing a single inmate contain at least 50 square feet and new cells housing two inmates contain at least 100 square feet. The decree further mandated increased staffing, improved medical care, and expansion of educational, vocational and recreational programs. Implementation of the provisions was scheduled to take place in stages over a period of five years.
 
 
 3
 After the agreement was reached, the Department of Corrections began to experience an unanticipated growth in inmate population which made it impossible to comply with some of the housing provisions of the consent decree. As a result, in July 1986 the Department of Corrections sought a temporary delay in compliance pending implementation of a State early-release program. The district court refused to grant an extension and ordered compliance. Although the Department of Corrections appealed, it achieved compliance in the interim, and the issue was mooted. Plyler v. Leeke, 804 F.2d 1251 (4th Cir.1986) (per curiam).
 
 
 4
 In May 1987, because of the unanticipated increase in inmate population, the Department of Corrections moved for a permanent modification of the consent decree to allow double-celling in five new facilities. Prior to the motion reaching the district court for disposition, a mediator and a United States Magistrate conducted hearings and made recommendations. The mediator recommended that temporary double-celling be allowed in 50% of the new cells. The magistrate recommended that double-celling be permitted in new cells for two years. Rejecting these recommendations in January 1988, the district court refused the modification request and ordered immediate compliance through early-release programs or other appropriate means. The district court then required the Department of Corrections to submit a plan which would have provided for the early release of approximately 700 inmates over the next three months. The district court orders were stayed pending this appeal.
 
 II.
 
 5
 Under the consent decree, inmates in the general population in new facilities who are confined to a cell less than 12 hours per day may be double-celled if the cells contain at least 100 square feet. The Department of Corrections seeks a permanent modification of this provision to allow double-celling at five new medium security facilities in cells which provide 69 to 73 square feet, depending on the facility. Two of these facilities, Lieber and McCormick, are now open, and the others, Broad River, Allendale and Marlboro, are in various stages of construction. Construction schedules call for Broad River to open in April 1988, and Allendale and Marlboro to open in early 1989.
 
 
 6
 Lieber contains 504 cells of 73 square feet each, and McCormick and Broad River have 504 cells of 69 square feet each.[1] The plans for Allendale and Marlboro were altered in May 1987 to provide for 296 cells of 69 square feet each and 208 cells of 100 square feet each.[2] The design plans for these five new facilities are based on the plans used for construction of the Federal Correctional Institution in Phoenix, Arizona which represents state of the art in correctional facilities. The cells are individual rooms constructed of painted concrete block with tile floors, each with a window and door. Each room is furnished with a sink and toilet, lockers, a desk and chair, and bunk beds. The inmates are allowed to have personal items, such as radios and televisions. They are confined to their rooms only from 11:30 p.m. to 6:00 a.m. All cells are centrally heated and air-conditioned.
 
 
 7
 These new facilities also provide a variety of amenities. For example, Lieber offers vocational programs in plumbing, carpentry, horticulture and automotive repair. The academic programs include high school equivalency and college classes. The prison industry employs inmates in automotive refurbishing. A variety of recreational activities is provided, including sports, crafts, and music. Dayrooms, visiting areas, and a cafeteria dining room are also provided.
 
 III.
 
 8
 The consent decree allows for modification by mutual and joint petition of the parties, and "[a]ny disputed petition for modification shall be reviewed by the Court under the applicable law pertaining to modification of Consent Decrees." The consent decree further provides a procedure by which the Department of Corrections may obtain variances from the space allotments in new construction not specifically addressed in the consent decree, such as Broad River, Allendale and Marlboro. In the event of a dispute, the court is empowered to "make a determination as to the reasonableness of or necessity for said variance, in light of but not limited to the requirements of this Decree and the totality of the conditions, and shall determine whether or not said variance shall be permitted."
 
 
 9
 The Department of Corrections seeks modification because of an unanticipated increase in prison population. As specified in the consent decree, it anticipated an average net increase of no less than 30, but no more than 50 prisoners per month from 1985 to 1990. In the past, official predictions had been fairly accurate. However, in the past several years actual increases in the number of inmates housed in Department of Corrections facilities have substantially exceeded the estimates. Statistics stipulated to by the parties show that monthly increases for 1985 reached a high of 212 in October with a yearly average of 74 per month. In 1986, highs of 233 occurred in March and September with a yearly average of 84 per month. The high for 1987 was 158 in October and the yearly average was 59 per month.
 
 
 10
 Pursuant to the decree the parties agreed that if the predictions proved to be inaccurate, "the Court shall order immediate relief, which may include population reductions, release or transfer of prisoners ... or other appropriate relief." We find that the appropriate remedy is modification of the decree to allow double-celling in the five new facilities.
 
 IV.
 
 11
 Generally, Federal Rule of Civil Procedure 60(b)(5) provides that the court may modify an order if "it is no longer equitable that the judgment should have prospective application." Under Nelson v. Collins, 659 F.2d 420, 424 (4th Cir.1981) (en banc), a consent decree may be modified in response to material changes in operative law or facts. As found by the district court, the unanticipated increase in population clearly is a change in operative facts which meets this predicate for modification. In addition, the court must balance the competing interests of the prisoners, the Department of Corrections, and the public. "[T]he interests of the prisoners in immediate and strict enforcement of the consent decree" must be weighed against the Department of Corrections' interest "in the orderly administration of the corrections system" and the public interest "in having lawful sentences carried out and in not having parolees put at large without sufficient supervision." Plyler v. Leeke, No. 86-7654, slip op. at 7 (4th Cir. Nov. 12, 1986) [804 F.2d 1251 (table) ] (per curiam).
 
 
 12
 The dissent maintains that the State must demonstrate oppression and that modification should only be allowed "upon a strong showing of near compulsion to grant relief." Infra at 216 (citing Holiday Inns, Inc. v. Holiday Inn, 645 F.2d 239, 240 (4th Cir.), cert. denied, 454 U.S. 1053, 102 S.Ct. 597, 70 L.Ed.2d 588 (1981); United States v. Swift & Co., 286 U.S. 106, 119, 52 S.Ct. 460, 464, 76 L.Ed. 999 (1932); Humble Oil & Ref. Co. v. American Oil Co., 405 F.2d 803, 813 (8th Cir.), cert. denied, 395 U.S. 905, 89 S.Ct. 1745, 23 L.Ed.2d 218 (1969)).[3] Although these cases may set a strict standard for modification of consent decrees between private parties, this standard is inappropriate in institutional reform litigation for "the unique nature and demands of institutional reform litigation necessitate a more flexible approach to modification." Ruiz v. Lynaugh, 811 F.2d 856, 860-61 (5th Cir.1987) (footnote omitted) (citing New York State Ass'n for Retarded Children, Inc. v. Carey, 706 F.2d 956, 970 (2d Cir.), cert. denied, 464 U.S. 915, 104 S.Ct. 277, 78 L.Ed.2d 257 (1983)).
 
 
 13
 The Constitution prohibits cruel and unusual punishment, but it does not specifically address prison conditions. For this reason, federal courts have traditionally adopted a policy of judicial restraint in the problematic area of prison administration. Procunier v. Martinez, 416 U.S. 396, 404-405, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1974); Duran v. Elrod, 760 F.2d 756, 759 (7th Cir.1985). Federal courts do intervene when prison conditions offend fundamental constitutional guarantees, Procunier, 416 U.S. at 405-06, 94 S.Ct. at 1807, but "the threat and constitutional value that occasions the intervention can never be defined with great precision.... [Therefore,] revision is justified if the remedy is not working effectively or is unnecessarily burdensome." Carey, 706 F.2d at 970 (quoting Fiss, The Supreme Court--1978 Term--Foreword: The Forms of Justice, 93 Harv.L.Rev. 1, 49 (1979)).
 
 
 14
 The district court here followed the flexible approaches utilized by this court in Nelson v. Collins and the earlier appeal in Plyler v. Leeke, finding that:
 
 
 15
 The need for the decree far outweighs the harm that will result to the defendants or the public if the decree is not modified. This court remains convinced that the public interest is best served by requiring the State of South Carolina to perform the promises it made to its citizens and others in this matter.
 
 
 16
 Plyler v. Leeke, No. 3:82-0876-2, slip op. at 12 (D.S.C. Jan. 11, 1988). Under the proper standard of judicial review, the district court's balancing of the competing interests will not be set aside except for an abuse of discretion. Plyler v. Leeke, No. 86-7654, slip op. at 11 (4th Cir. Nov. 12, 1986) [804 F.2d 1251 (table) ] (per curiam); Duran, 760 F.2d at 762. In assessing the district court's exercise of discretion, its findings of fact are subject to the clearly erroneous standard. Fed.R.Civ.P. 52(a). We find that the district court clearly erred in assessing the degree of potential harm to the inmates as contrasted with the risks to the public and it abused its discretion in denying the current request for modification.
 
 A.
 
 17
 First, the district court erred in assessing the right of the prisoners to the benefits of the settlement. As the Second Circuit recognized in Carey, consent decrees such as this in institutional reform cases "are not so much peremptory commands to be obeyed in terms, as they are future-oriented plans designed to achieve broad public policy objectives in a complex, ongoing fact situation." 706 F.2d at 970 n. 17 (quoting Chayes, The Supreme Court--1981 Term--Foreword: Public Law Litigation and the Burger Court, 96 Harv.L.Rev. 4, 56 (1982)). The court here failed to recognize that the central goal of the decree is to provide constitutional prison conditions, and instead focused inappropriately on the double-celling provision.
 
 
 18
 Although double-celling will be contrary to a specific term of the consent decree, the prisoners have received the essence of their bargain. Not only have all of the many terms of the agreement, except double-celling in five new facilities, been met, but also the general conditions of confinement now not only meet, but exceed constitutional requirements. In the balance, compelling the State to achieve compliance through the early release of massive numbers of inmates would create substantial dangers which are unjustified in view of the State's good faith efforts to adhere to the consent decree.
 
 B.
 
 19
 The State has embarked on an aggressive agenda of new prison construction, expending more than one hundred million dollars on capital improvements over the past few years. The State forged ahead with construction of Lieber even before a final settlement was reached. And, the facilities at Broad River, Allendale and Marlboro are under construction even though not specifically required by the agreed upon construction and renovation schedule. The General Assembly appropriated $155,000,000.00 in capital improvement financing for the Department of Corrections for 1984 to 1987 which includes the new construction costs at an average of $41,000.00 per cell. Under no circumstances can it be argued that the State has been miserly or dilatory.
 
 
 20
 We accept the district court's finding that the increases in inmate population were, to some extent, within the State's control, but we disagree with the dissent that we must accept the implicit finding that the State has not made a good faith effort to comply with the decree. Even accepting the finding that the increases were in part due to criminal laws enacted after the consent decree and to new parole policies, this finding is not conclusive on the issue of good faith. The district court failed to distinguish the State's indirect control from the direct cause of the increases--the commission of crimes. Further, enactment of stricter criminal laws should not be considered bad faith. It is not disputed that the State is meeting its responsibility to provide constitutional prison conditions. It need not allow those convicted of crimes to go unpunished in order to comply with a single, arbitrary provision governing the size of prison cells.
 
 C.
 
 21
 While proceeding with new construction, the State also instituted early-release programs to alleviate prison overcrowding. Prison Overcrowding Powers Act, S.C.Code Ann. Secs. 24-3-1110, et seq. (Law. Co-op. Supp.1987) (also known as the Emergency Powers Act; EPA I, EPA II); Supervised Furlough Program, S.C.Code Ann. Secs. 24-13-710, et seq. (Law. Co-op. Supp.1987). Approximately 7,000 inmates were released under these programs from September 1983 to August 1987. Of these 7,000, 18.8% returned to prison after the commission of new crimes, 1.3% for violent crimes and 17.5% for nonviolent crimes. As the district court found, the recidivism rate for inmates released under these programs was lower than for inmates released through the normal parole process. Based on these statistics, the district court was "not persuaded that public safety would be substantially lessened by the employment of these early release mechanisms." Slip op. at 10.
 
 
 22
 However, the district court failed to consider additional evidence which clearly demonstrates that the continued effectiveness of these programs has been impaired because their extensive use has depleted the pool of inmates who can be released with a relative degree of safety to the public.[4] As of August 1, 1987, shortly prior to the evidentiary hearing held by the magistrate, 880 inmates were statutorily eligible for early release under EPA II. Of these 880 inmates, 30 were classified as low risk, 157 as moderate risk, and 693 as high risk. Low risk inmates have a 7.6% failure rate upon release.[5] In comparison, the failure rates for moderate and high risk inmates are 22.6% and 44.7%, respectively.
 
 
 23
 The district court failed to consider other potential dangers from the early release of high risk inmates in addition to the threat to public safety. Under the court-ordered plan inmates would be released from minimum security prisons, and medium security inmates then would be transferred to the minimum security facilities. This would create a potential danger to the remaining minimum security inmates and Department of Corrections personnel. There would also be an increased risk to the general public due to a greater potential for escapes from the minimum security facilities, some of which are not enclosed by a single fence.
 
 
 24
 These dangers far outweigh any imposition on the inmates from double-celling. It is undisputed that double-celling in these modern, air-conditioned facilities does not fall below constitutional standards. See Rhodes v. Chapman, 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981). Interestingly, the consent agreement allows continued partial double-celling at older Department of Corrections facilities such as Central Correctional Institution, Perry Correctional Institution, and Kirkland Correctional Institution in cells of 56.36, 60.5, and 67.4 square feet, respectively. The total environment of these new facilities is without question superior to that of the older facilities.
 
 D.
 
 25
 The district court found that prison overcrowding creates the potential for greater violence and makes proper management more difficult, relying on the testimony of Deputy Commissioner Catoe that "there's a generally accepted position on the part of people who run institutions that as an institution gets bigger, as the inmate population increases, the management of that institution becomes more difficult." The court's finding based on such a general statement is clearly erroneous when measured against contradictory objective evidence of the actual incidences of violence and Commissioner Catoe's inconsistent opinion that the statistics did not show a "disproportionate increase in violence." See Anderson v. Bessemer City, 470 U.S. 564, 575, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985) ("Documents or objective evidence may contradict the witness' story; or the story itself may be so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it. Where such factors are present, the court of appeals may well find clear error....").
 
 
 26
 Lieber is the only new facility at which double-celling has yet occurred. From the time double-celling began in February 1987 through July 1987, there were seven assaults without weapons and five with weapons.[6] In contrast, from its opening in June 1986 through January 1987, when inmates were single-celled, there were twelve assaults without weapons and five with weapons. And while Commissioner Catoe stated generally that increased population complicates management, he assured the court that the State would be able to provide the programs and opportunities required by the decree if Lieber were double-celled.
 
 V.
 
 27
 While prison overcrowding has been an increasing problem nationwide, remedial measures are now being taken under numerous court orders and consent decrees. However, correctional authorities attempting to comply with these orders and decrees are faced with the prevalent problem of increased prison populations. As a result the courts are, with increasing frequency, addressing requests for modification. The modification granted here is consistent with decisions rendered by this court and others under similar requests.
 
 
 28
 In Nelson v. Collins we reversed the district court's refusal to approve double-celling at a modern, new facility in order to alleviate overcrowding at older facilities. 659 F.2d at 429. There, the Maryland State Prison System was directed by court order to relieve unconstitutional double-celling at two facilities and had entered into a consent decree regarding another facility. Subsequent to these decrees, the Supreme Court issued its decisions in Bell v. Wolfish, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), and Rhodes v. Chapman, 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981), clarifying the requirements of the eighth amendment as applied to correctional facilities. In addition, there were substantial changes in the conditions in the Maryland prison system. As here, Maryland had begun new construction in a concerted, good faith effort to meet the deadlines imposed by the decrees. But at the same time, Maryland also was faced with an unanticipated increase in its prison population. Taking into consideration the changed circumstances, this court found that the state was entitled to a modification in view of its good faith efforts and the clearly constitutional standards maintained at the new facility. 659 F.2d at 429.
 
 
 29
 Similarly, in Duran v. Elrod, the Seventh Circuit granted modification of a consent decree to allow double-celling in a county jail, reversing the district court's refusal to do so. 760 F.2d at 763. Although the county had been dilatory in renovation and expansion of the jail, the court still found the modification reasonable in light of an "unremitting" increase in jail population and the potential harm to the citizens of the county. Id. at 761-62.
 
 
 30
 In contrast, modification of a consent decree regarding overcrowding in Texas prisons was refused in Ruiz v. Lynaugh, 811 F.2d 856 (5th Cir.1987). The court found that a foreseeable and ordinary increase in prison population did not justify modification. Id. at 862. Further, the requested modification would have allowed housing of inmates at facilities which did not meet other standards for basic services and conditions. See id. at n. 10. The conditions existing in the Texas prison system which supported the Fifth Circuit's refusal to allow modification are not present in the case before us. Unlike Texas, the increase in prison population was unanticipated. In addition, except for double-celling at five new facilities, all terms and conditions of the consent decree as well as all constitutional standards are being met by the State of South Carolina.
 
 VI.
 
 31
 The State of South Carolina voluntarily entered into a consent decree agreeing to certain terms and obligations and there is an initial inclination to hold the State to the letter of their agreement, as the district court did. However, this is not an ordinary contract between private parties to be strictly enforced. It is a compromise between the State and its inmates aimed at providing constitutionally adequate prison conditions. And, a flexible approach must be taken in addressing requests for modification.
 
 
 32
 The Department of Corrections and the General Assembly have demonstrated considerable good faith in attempting to attain total compliance. But, they have faced an unanticipated increase in inmate population, a problem common to prison systems across the nation. For example, the state-of-the-art prototype federal facility at Phoenix, on which the State institutions are modeled, was intended to provide single-celling, but within the first year of its opening, all inmates were double-celled. And despite the increases in population, the State has achieved the central goal of the decree--constitutionally adequate conditions of confinement.
 
 
 33
 Further, any solution to the problem not only affects the inmates and the Department of Corrections, but also the general public. Strict compliance would impose on the citizens of South Carolina a system which would increase the risk of danger to the general public if inmates who had not completed lawfully imposed sentences were prematurely discharged. Again, this risk far outweighs any imposition on inmates as a result of double-celling in the five new facilities described above.
 
 
 34
 The order of compliance is vacated and the case is remanded to the district court for modification of the consent decree to allow double-celling at the five new facilities. The district court will retain jurisdiction with the authority to provide appropriate remedies should the double-celling result in unconstitutional conditions of confinement.
 
 
 35
 VACATED and REMANDED with instructions.
 
 
 36
 JAMES DICKSON PHILLIPS, Circuit Judge, dissenting:
 
 
 37
 In a matter of this much public importance, it is particularly desirable that our decisions be, if at all possible, unanimous. For that reason I have more than the ordinary regret that I cannot join the majority decision here. I cannot, however, because I believe that under the standards of appellate review that constrain us--and whose integrity, along with the authority of the district courts that they protect, are also of great and ongoing public importance--we cannot properly reverse the district court's carefully reasoned and supported decision. That decision--that the requested modification of the consent decree by wholly abrogating its double-celling provision was not warranted--seems to me unassailable on the facts of record, the controlling equitable principles and the applicable standards of review. For that reason, I would affirm the district court's decision to deny the modification and hold the state to compliance (though with the grace period allowed by the district court).
 
 
 38
 * The essential factual and procedural background of this appeal is adequately outlined in the majority opinion. I emphasize a few elements that are particularly relevant to my view that the district court should be affirmed, and that point up the importance of the standards that should govern our review.
 
 
 39
 The first point is that the modification requested, and now ordered by this court, was complete revocation of the critical double-celling provision of the consent decree, not just a modification of the timetable for compliance with that provision. The next point is the centrality and independent nature of the double-celling provision. While that provision was only one among several others with which the SCDC has complied--a point much emphasized by the majority opinion--there is no question that the double-celling provision was among the most critical and important--to both sides. The modification sought was therefore one having the ultimate effect of total abrogation of a fundamental and independent provision of the consent decree, not one dealing only with peripheral matters not central to the bargained agreement.
 
 
 40
 The basis upon which modification was sought by the state defendants was simple in essence: "unanticipated increase in inmate population" over the projections upon which the state relied in entering into the agreement originally.
 
 
 41
 The equitable principles which guide an injunction court's first instance decision whether to grant such a modification are clear though undoubtedly frequently difficult to apply. Modification may be allowed when, as a threshold matter, "changes either in operative facts or laws ... cast a new light upon the facts or law originally ruled on." Nelson v. Collins, 659 F.2d 420 (1981), but then only when the change in circumstances has been largely beyond the moving party's control, was not foreseeable either by the parties or the court, and has put compliance in accordance with the decree beyond effective reach despite a good faith effort by the moving party to comply, id. at 424, and finally, when, in light of the changed circumstances and its cause and consequences, a balancing of the interests of the opposing parties and the public requires modification in the interests of equity. See United States v. Swift & Co., 286 U.S. 106, 115-19, 52 S.Ct. 460, 462-64, 76 L.Ed. 999 (1932).
 
 
 42
 This power to modify derives ultimately from the inherent powers of equity courts and is now directly expressed in Fed.R.Civ.P. 60(b)(5). See generally 11 Wright & Miller, Federal Practice and Procedure: Civil Sec. 2863. It is a power which, for obvious reasons, is to be exercised cautiously, and only upon a strong showing of near compulsion to grant relief. See Holiday Inns, Inc. v. Holiday Inn, 645 F.2d 239 (4th Cir.1981) (movant must demonstrate "oppression," citing United States v. Swift & Co., 286 U.S. 106, 119, 52 S.Ct. 460, 464, 76 L.Ed. 999 (1932)); Humble Oil & Ref. Co. v. American Oil Co., 405 F.2d 803, 813 (8th Cir.1969) (Blackmun, J.) ("caution, substantial change, unforeseeness, oppressive hardship, and a clear showing are the requirements").[1] At stake is the finality and stability of judicial decrees confirming solemn agreements between parties.
 
 
 43
 Though in its final balancing process the judicial decision whether to modify is a "discretionary" one, that balancing must necessarily be based upon the factual predicates implicit in the modification standard. These will necessarily include whether substantial change has actually occurred; whether the changes were actually beyond the moving party's control and were unforeseeable; whether the movant has made a good faith effort at compliance; and the factual nature of the harms threatened to the parties and to the public by granting or denying the requested modification.
 
 
 44
 To the extent any of these predicate facts have been in dispute, they, like all factually disputed issues, must of course be resolved in the first instance by the injunction court. As so resolved, they must then be treated as findings of fact and accorded appellate deference under the clearly erroneous standard of Fed.R.Civ.P. 52(a). For though findings of fact may not be specifically required in conjunction with motions to modify, see Fed.R.Civ.P. 56(a), there is obviously no reason to treat findings actually made on such a motion differently for this purpose from those found on the much less critical motions for preliminary injunctive relief, as to which findings are specifically required and protected by the clearly erroneous standard under Rule 52(a). The courts, including this one, have so treated them. See Holiday Inns, Inc., 645 F.2d at 242; id. at 247 (dissenting opinion); Ruiz v. Lynaugh, 811 F.2d 856, 861-62 (5th Cir.1987); and see generally 9 Wright & Miller, Federal Practice and Procedure: Civil Sec. 2575, p. 694 (findings per Rule 52(a) "desirable and ought to be made" "whenever decision of a matter requires the court to resolve conflicting versions of the facts").
 
 
 45
 The point of all this is that to the extent the district court's ultimate "discretionary" decision to deny modification here was based upon factual predicates established, on conflicting evidence, by the fact-finding process, we owe those underlying findings the deference generally owed judicial fact findings on the merits, and for the same reasons. See Anderson v. City of Bessemer City, 470 U.S. 564, 574-75, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1984) (deference based both on superiority of district court's vantage point and on need to avoid duplication of fact-finding process at appellate level). And this, in turn, means that in assessing whether the ultimate discretionary decision to deny modification here was an abuse of discretion we must assess that decision in light of the district court's factual predicates, unless we can reject those predicates as clearly erroneous. That is to say, we may no more disregard critical fact findings in this context than in any other in which they provide the factual predicates for ultimate decisions--whether of law, fact, or discretion. Cf. Zaldivar v. City of Los Angeles, 780 F.2d 823, 828 (9th Cir.1986) (decision whether to impose Rule 11 sanctions is composite of discretionary, fact-finding and legal rulings, and must be reviewed accordingly).
 
 II
 
 46
 Reviewed on this basis, the district court's ultimate decision to deny the requested modification should be affirmed. Its critical factual predicates, either undisputed or as found on conflicting evidence, are not clearly erroneous. If, as is proper, those predicates are accepted, the court's ultimate decision to deny modification cannot properly be rejected as an abuse of discretion; in fact it reflects an eminently sound exercise of discretion.
 
 
 47
 A helpful way to demonstrate this is by focussing on the factual predicates upon which the district court largely rested its decision, but which are either disregarded, discounted, or supplanted with conflicting findings by this court sitting in review.
 
 
 48
 Take first the critical question whether the state defendants had sought in good faith to achieve compliance with the double-celling provision, and the closely related question whether the changes urged as cause for modification were beyond these defendants' effective control. The district court found that "most, if not all, of the increases in population" were within the defendants' control.[2] In support, the court properly pointed to irrefutable evidence that despite specific warnings by state officials of the adverse effect on the state's ability to comply with the decree, the state legislature nevertheless had enacted legislation that directly increased the inmate population beyond the level that uncontrollable factors would have produced. The court also pointed to policy changes by the state Parole Board that had the same effect.
 
 
 49
 On the intertwined question of the state defendant's good faith effort to comply, the district court pointed to the stark fact that the defendants had knowingly, and without any explanation, baldly violated the decree by constructing double-occupancy cells smaller than the decree required. No more than the reference was required to support the district court's obvious skepticism about the quality of the defendant's effort.[3]
 
 
 50
 Take next the question whether the change upon which defendants relied--the increase in inmate population--was both substantial and unforeseen at the time the consent decree was entered. The district court of course recognized that increases amounting to "changes in the operative facts" had occurred, and at least implicitly found that they were substantial enough to warrant consideration.[4] But the court rightly questioned whether, as a factual matter, they were actually unforeseen by all involved--in particular, by the state defendants. This is completely supported by the fact that the decree itself expressly recognized that the inmate population projections might be on the low side. From this it was fairly inferable that in undertaking the decree's obligations the state defendants knowingly accepted the resulting risks that planning and budgetary adjustments might later be required to reach compliance; that is, that the changes were not only not unforeseen but expressly contemplated.
 
 
 51
 Turn to the critical question of the nature and degree of harms threatened to the interests of the parties and the public. As to the plaintiffs, the district court found that to permit the double-celling requested would pose substantial risks of increased violence and other harms resulting from the crowding of facilities that this would permit. Specifically, the court found that to permit the requested double-celling would result in a prison with a design capacity for 504 inmates being permitted to house over 1,000. And, relying directly on the testimony of Deputy Commissioner Catoe, the court found that this in turn would result in numerous problems of prison management, including increased threats of violence, a lack of sufficient jobs for inmates, and inadequate general facilities, service and programs.[5]
 
 
 52
 Finally, in assessing the threat of harm to the interests of the state defendants and the public if modification were not granted, the district court appropriately measured this by considering the impact of forced compliance through the early release of 700 inmates over a four-month period. In this connection, the court found specifically that under various early release mechanisms expressly provided by the state legislature, 6,883 inmates had already been released between September 1983 and August 1987, and that of these only 90, or 1.3%, had been returned to prison for commission of violent crimes. Relying on this data and the testimony and findings of fact by Allen Breed, the mediator provided for in the consent decree, the court concluded that the overall recidivism rate for inmates given early release pursuant to state law was actually less than that of inmates released in regular course through the parole process. On that basis, the court concluded that ordering a specific early release of 700 of those inmates generally qualified under extant state law would pose no substantial threat to the public safety, the interest primarily asserted by defendants.[6]
 
 
 53
 As indicated, all of these critical findings are either disregarded, discounted, or rejected outright by the majority in reversing the district court's order. Concededly, there is evidence in the record which, if accepted, would support some of the conflicting findings either explicitly or implicitly adopted by the majority in its analysis of the evidence. But if we are faithful to our highly deferential review function in such matters, we cannot reject findings simply because we disagree with them and can find support in the evidence for our disagreement. We cannot properly reject any but clearly erroneous findings, and "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." Anderson, 470 U.S. at 574, 105 S.Ct. at 1511. Indeed we may not properly reject any "account of the evidence that is plausible in light of the record viewed in its entirety," id., and the mere fact that the critical findings here on the questions of good faith, foreseeability, and threatened harms are ultimate, evaluative findings based upon inference rather than raw, historical findings based on direct evidence does not diminish the deference we are directed to give them. Pullman-Standard v. Swint, 456 U.S. 273, 287, 102 S.Ct. 1781, 1789, 72 L.Ed.2d 66 (1982).
 
 
 54
 Here, with all respect, I do not see how we could say of the critical findings above summarized that they were not, at a minimum, "plausible accounts of the evidence," or at least one of the "permissible views of the evidence." Accordingly, I would consider this court bound by them; and being so bound, would conclude that the district court was well within its discretion in denying, on their basis, the requested modification. I would therefore affirm its order designed to bring the defendants into compliance with the original decree within the grace period provided.
 
 III
 
 55
 This is a hard case. The problem presented for the state by the rigor of the double-celling restrictions and the increase in inmate population is real and substantial. But so are the problems presented by allowing the state on the record in this case to be wholly relieved of an obligation solemnly undertaken by its highest executive officials and specifically endorsed by its legislature. The district court, which had lived intimately with the problem over a long period of time, was satisfied after a scrupulously fair evidentiary airing that the state had not established its entitlement to the drastic relief it sought. I believe that the district court correctly applied the appropriate equitable principles to the critical facts it quite properly had found in reaching that decision. I think we err and send dangerous signals about the integrity of this sort of institutional consent decree and the fact-finding and discretionary authority of our base-line courts when we decline to affirm that decision.
 
 
 56
 A major concern in considering motions to modify injunctive decrees, whether consensual or court-imposed, is that the procedure not be used to re-examine the basis of the original decree rather than the equity of its modification. Care must be taken not to "impeach" the injunction "in its application to the conditions that existed at its making" while ostensibly considering whether to modify it because the conditions have changed; courts may not properly "reverse under the guise of readjusting." United States v. Swift & Co., 286 U.S. 106, 119, 52 S.Ct. 460, 464, 76 L.Ed. 999 (1932) (Cardozo, J.). Yet I fear that this is essentially what has now been done here. The state has not hesitated both in the district court and here to suggest, while primarily pressing the legally appropriate changed circumstances theory, that the real cause of its problem is the improvidence of those of its former officials who under a previous administration made the original undertaking. We were told on oral argument by counsel for the state that the projections at that time were "incompetent" and were due to "inadvertence." This is obviously not an argument that a judicially approved undertaking, fair and sound in its inception has been made "oppressive" by unforeseeable and uncontrollable extrinsic developments, but that the original undertaking was not soundly based, and should on that basis be "impeached" or nullified. Such a theory obviously could not be accepted as the specific basis for equitable relief from such consent decrees. The effect would be to make judicially approved institutional undertakings by one generation of state officials always subject to possible nullification by the second-guessing of their successors.
 
 
 57
 The district court was obviously aware of this subsidiary argument and rightly gave it no credence. While the majority here does not give this as a basis for its decision, the remedy it gives is perfectly compatible with that theory. For the remedy is utterly to abrogate the specific consensual obligation of the state respecting double-celling, thereby relegating the inmate-plaintiffs to unproven and possibly unprovable constitutional overcrowding claims. By this draconian remedy the majority has effectively treated the undertaking as a nullity from its inception, not as one whose unforeseen rigors might be adjusted on some equitable basis while retaining its essence. Cf. Ruiz v. Lynaugh, 811 F.2d at 862-63 (distinguishing impermissible "modification" which completely vitiates "original obligations" from permissible one which merely alters duties under original decree).
 
 
 58
 By this means the state's gamble in violating its solemn obligation has been vindicated, and that, I submit, is not the sort of equity at which the injunction modification principles are aimed.
 
 
 59
 I therefore respectfully dissent.
 
 
 
 [1]
 The five new facilities also contain segregation cells which house only one inmate and for which no modification is requested
 
 
 [2]
 Contrary to the assertion of the dissent, the State did not "baldly violate" the decree by constructing double cells smaller than the decree required. Infra at 218. It is undisputed that the cells were intended as single cells. But, it has never been satisfactorily explained to the court why, in the face of an agreement which required single cells to contain 50 square feet and double cells to contain 100 square feet, the Department of Corrections approved plans for single cells to contain 69 or 73 square feet
 
 
 [3]
 Judge Phillips argued against such an "overly rigid standard for relief" in his dissent in Holiday Inns, urging a flexible standard "greatly dependent upon the particular facts of the case." 645 F.2d at 244, 245. He read Swift & Co. "simply as a description of the proper exercise of those powers in the particular context of the case before that Court rather than as a general prescription for their exercise in all cases." Id. at 245. We agree that the general teaching of Swift & Co. "is merely that harm and continuing need must always be weighed in the balance in deciding whether continued enforcement of any injunctive decree is equitable in the light of specific changed circumstances." Id. As Judge Phillips further noted, and as evidenced in Nelson v. Collins, this court has "been properly selective and flexible in our application of the Swift & Co. standard, depending upon the nature of the litigation, the injunction at issue and the scope of the relief sought." Id
 
 
 [4]
 This is shown by statistics compiled by the South Carolina Department of Parole and Community Corrections
 
 
 [5]
 This failure rate refers to inmates returned to the custody of the Department of Corrections for convictions on new offenses with sentences of more than 90 days. This rate does not include revocations for technical parole violations
 
 
 [6]
 These incidents reported from February 1987 through July 1987 represent only those assaults committed by general population inmates who are the only ones double-celled at Lieber
 
 
 [1]
 The majority suggests that in "institutional reform" consent decree cases of this type, a more flexible approach to modification than that espoused in United States v. Swift & Co. for the run of cases is warranted, and rightly points out that in Holiday Inns, a purely private party action, I myself urged, in dissent, a more flexible approach to modification than that taken in that case by the majority in reliance upon the Swift & Co. standards. For the proposition that a more flexible standard in general is warranted in the instant type case, the majority cites principally to Ruiz v. Lynaugh, 811 F.2d 856, 860-61 (5th Cir.1987), which had recognized, without adopting, such an approach in New York State Assoc. for Retarded Children, Inc. v. Carey, 706 F.2d 956, 970 (2d Cir.1983)
 A study of these decisions, and indeed of our own decision in Nelson v. Collins, 659 F.2d 420 (4th Cir.1981) (en banc), whose authority I of course recognize, reveals that to the extent they espouse greater flexibility as a general proposition in this type case, it is only as a matter of degree that undoubtedly reflects the need to pay particularly close attention to the heightened public interest inherent in such cases. Ruiz, for example, recognized that those courts espousing in general a more flexible approach "still adher[ed] to the Swift principles that a modification should not vitiate the decree," 811 F.2d at 861. And New York State Assoc.'s greater flexibility involved only relaxing the requirement that the changed circumstances be "unforeseen," with the movant still required to show change and a good faith effort to comply in order to secure a modification limited to alteration of duties under the original obligations without completely vitiating them. 706 F.2d at 969-70.
 I completely agree that even under the Swift principles, rightly understood, such a degree of flexibility is appropriate in the ultimate balancing process required in deciding whether modification of such decrees is warranted. My analysis of the district court's decisional process here assumes that such "flexibility" necessarily existed.
 
 
 [2]
 In assessing whether the changes were beyond the power of the moving party to control, the court rightly looked to the power of the state as a whole rather than just the state Department of Corrections and its commissioners as the nominal moving parties. The Department of Corrections obviously could not in equity be allowed to assert that only its unaided power to comply should be taken into account. Aside from the fact that its party status is obviously that of an "arm of the state," the state legislature had both authorized and then endorsed the consent decree which was effectively negotiated by officials of the state Attorney General's Department. The decree is therefore one to which the state itself is fully bound in law and equity as well as consensually, with all that implies for funding by the legislative branch and implementation by the executive
 
 
 [3]
 Significantly, the majority can only observe of this remarkable conduct that it "has never been satisfactorily explained." Slip op. 210, n. 2. That is certainly the case, but it hardly addresses the serious legal problem thereby raised. As moving party, the state had the burden to establish its good faith effort at compliance as one of the essential predicates for modification. Its failure even to attempt explanation of conduct that so obviously draws its good faith in question certainly supports the minimal inference that the true explanation would not have been helpful. Whatever the undisclosed basis for the conduct, its effect was to present the court with an awkward fait accompli that made compliance now more costly than it need have been. Surely equity would not be served by weighing this fait accompli in the state's favor, whatever it says about good faith
 The majority finds in the general excellence of the new facilities being constructed and in the overall sums being expended to upgrade the whole correctional system the good faith efforts that the district court rightly questioned. Without questioning the facts on which the majority relies, they are, with all respect, largely irrelevant to the specific question whether there has been a good faith effort to comply with the double-celling provision. And without minimizing the overall financial burden being borne by the state in upgrading the whole system, it must in fairness be noted that this has to be ascribed in major part to the constitutional compulsion to do so that undoubtedly underlay the state's original entry into the consent decree.
 
 
 [4]
 Later developments, not fully before the district court, may raise a question about the substantiality of the "change" over the longer haul. On oral argument we were given a party stipulation which revealed that in 1987 the monthly average increases in inmate population had significantly dropped from the 1985 and 1986 levels upon which the defendants heavily relied. In 1985 the figure was 74; in 1986 it had peaked at 84. But in 1987, it dropped to 59, just 9 above the originally projected figure of 50 per month
 It appears that the state may well have been released from an obligation not nearly as onerous over time as the short-term figures suggested.
 
 
 [5]
 The majority essentially rejects this factual determination of the district court by substituting its own assessment which discounts the threat of increased violence and management problems from increased crowding. There is undoubtedly evidence in the record to support the majority's conflicting factual assessment. There had not to date been any appreciable increase in violence in the affected facilities, and some prison officials gave the opinion, at odds with Commissioner Catoe's, that even with the greater inmate populations resulting from double-celling, the facilities would be adequate to provide general services and programs
 While the majority's view is undoubtedly a permissible one on the conflicting evidence, so is the district court's, and in such a situation, we have been directly admonished to defer to the fact-finding court's assessment. See Anderson, 470 U.S. at 574, 105 S.Ct. at 1511.
 
 
 [6]
 Here again, the majority essentially rejects this factual determination of the district court--probably the most critical in the balance of interests--by substituting its own conflicting assessment of a much greater threat to public safety and internal order from the early releases required to bring the state into compliance. The district court had, however, carefully assessed the data, heard the testimony, and responsibly considered the actual threat posed. Critical to that assessment were the fundamental facts that the 700 inmates to be released would come from the group generally qualified under extant state law for consideration; that they would be released at intervals over time and not all at once en masse; and that they would in any event all be released in normal course in a relatively short additional time
 While the majority does not of course directly reject these irrefutable facts of the matter, its assessment seems basically to accept the specter raised by the state of a sudden release of 700 potentially violent inmates who otherwise would remain incarcerated indefinitely.
 This is based in large part on the state's unsupported assertion that the conceded effectiveness and safety of the early release program has now been compromised by a reduction of the number of eligible inmates who can be released "with a relative degree of safety to the public." This in turn is based upon the fact that of the 880 inmates statutorily eligible for early release consideration, 693 recently have been reclassified by the current administration as "high risk" or as posing a 44.7% failure rate. The problem with this is that there is no evidence that these "high risk" inmates in the statutorily approved pool are any different in risk terms from those being "safely" released before the new risk assessment program. The majority simply accepts the state's estimate, rather than the district court's.