**LORAIN NAACP, et al., Plaintiffs,**

v.

**LORAIN BOARD OF EDUCATION, et al., Defendants.**

No. C79–1775.

United States District Court, N.D. Ohio, E.D.

June 21, 1991.

Thomas I. Atkins, Brooklyn, N.Y., James L. Hardiman, Cleveland, Ohio, David W. Whitaker, Jr., Ph.D., Beachwood, Ohio, Grover G. Hankins, Asst. Gen. Counsel, NAACP, Baltimore, Md., Ronald J. Ruskan, Lorain, Ohio, for plaintiffs.

Anthony B. Giardini, Bradley & Giardini Co., LPA, Lorain, Ohio, Rita Eppler, Richard W. Ross, Asst. Atty. Gen., Federal Litigation Section, Columbus, Ohio, for defendants.

## MEMORANDUM OPINION

DOWD, District Judge.

## I. INTRODUCTION

Before the Court in the above-captioned case [1] is the issue of what amount of additional funding defendant the Board of Education of the State of Ohio ("State") should be required to contribute to the desegregation program in the Lorain City Schools. On January 29, 1990, defendant the Lorain Board of Education ("Lorain") filed a motion for an order requiring defendant the State to increase its share of the costs of implementing and completing the Desegregation Plan stemming out of the Consent Decree entered in this case, (Docket No. 279). The State filed a memorandum in opposition to Lorain's motion in which the State argued that the Consent Decree is a contract which was negotiated at arms length and as such is not modifiable except in certain specified exceptional circumstances. The State argued that Lorain can-

---

1. This case was initially filed on September 13, 1979, and was assigned to Judge Robert Krupansky. The plaintiffs brought the action on behalf of themselves and as representatives of a class of persons consisting of all minority persons who reside in the Lorain City School District, against the Lorain Board of Education and the Board of Education of the State of Ohio, and all other individual defendants. Plaintiffs' complaint alleged that the defendants engaged in a pattern or practice of discrimination against Blacks and Hispanics by closing certain school facilities, by the way in which Lorain assigned students, and by methods of hiring and methods of assigning teachers and administrators.

The case was transferred to Judge Ann Aldrich on May 21, 1980, and to Judge Alvin Krenzler on December 30, 1981. On December 21, 1982, the case was transferred to the docket of this Court.

The Court proceeded to set the case for trial. The Court subsequently was put on notice that the parties were attempting to settle the case. In an Order dated February 24, 1984, (Docket No. 46), the Court ordered the parties to lodge the Consent Decree with the Court for the Court's approval. The Court preliminarily approved the Consent Decree on May 15, 1984, (Docket No. 62), and later held a hearing to determine whether the Consent Decree should be approved as fair, adequate and reasonable. The Court approved the Consent Decree on August 13, 1984, (Docket No. 76).

not demonstrate that modification of the Consent Decree is warranted in the present case.

In an Order dated May 24, 1990, (Docket No. 307), the Court denied Lorain's motion to modify the Consent Decree with respect to increased State funding. Lorain subsequently filed a motion for reconsideration of the Court's March 24, 1990 Order denying Lorain's motion for a modification of the Consent Decree, (Docket No. 309). Lorain argued in its motion that if the Court does not modify the Consent Decree and increase the State's contribution to the Desegregation Plan, then the goals of the Consent Decree will not be met. The State filed a memorandum in opposition to Lorain's motion for reconsideration on June 25, 1990, (Docket No. 314), in which the State asserted the same arguments as were presented in its original opposition motion and requested that the Court deny the motion for reconsideration.

Following the filing of the motion for reconsideration, the Court conducted an evidentiary hearing on the matter on July 25, 1990. The Court then gave the parties the opportunity to file post-hearing briefs on the merits of Lorain's motion for an order requiring the State to increase its contribution to the Desegregation Plan. After considering the evidence before it and the legal arguments presented, the Court reconsidered its prior ruling and issued an Order on August 17, 1990 in which it found that the Consent Decree should be modified by an increase in the State's contribution to the Lorain Desegregation Plan.[2] The Court declined to arrive at a particular dollar figure which the State would be required to contribute in its August 17, 1990 Order. Instead, the Court instructed the parties to engage in negotiations in an effort toward arriving at the amount of additional State funding.

Following the issuance of the August 17, 1990 Order, the State filed a motion asking for a clarification of whether or not the Court's August 17, 1990 Order is a final appealable order, (Docket No. 338). On September 12, 1990, the Court responded by indicating that, in the Court's view, the August 17, 1990 Order is not a final appealable order since the Order merely indicated an intention to modify the Consent Decree and encouraged the parties to enter into negotiations regarding an increase in funding but did not order the State to pay a particular dollar amount, (Docket No. 339). The Court indicated, however, that in the event negotiations proved fruitless, then the Court would make a definitive determination with regard to the increased State funding, and, at that point, there would be a final order for purposes of appeal.

The Court was under the impression following the issuance of its August 17, 1990 Order that the parties were indeed engaging in meaningful negotiations toward arriving at a solution for the funding problem. The Court has since discovered that the negotiation process was far from successful. The State has from the inception of this controversy taken the position that it should not be required to contribute *any* additional funds to the Lorain desegregation program. The State has agreed on various occasions to provide "technical assistance" to Lorain. The State continues to maintain, however, that the ceiling amount which it was required to pay under the Consent Decree, i.e., $1,000,000.00, has been paid by the State and its obligation under the terms of the Consent Decree has been fully complied with.

In February of 1991, the Court became convinced that the negotiation process could not solve the present controversy. Accordingly, the Court convened the parties for a status conference at which the Court discussed a myriad of issues relating to the Lorain City School District. The Court discussed, *inter alia,* the status of the magnet schools in place in Lorain, the operation of the bilingual program in place in Lorain, and, the extent to which Lorain has been attempting to or has met the hiring goals as set forth in the Consent Decree. The Court also indicated to the parties that it would conduct an extensive

---

**2.** The legal analysis upon which the Court's opinion rested will be presented in full and expanded upon in the present Memorandum Opinion.

evidentiary hearing for the purpose of determining the precise amount which the State should be ordered to contribute to the desegregation program in Lorain. The Court indicated that facts regarding Lorain's financial situation, the operation of the magnet schools in Lorain, the operation of the bilingual program in Lorain, the efforts at achieving the hiring goals set forth in the Consent Decree, as well as the facts surrounding the entrance into the Consent Decree by the parties in the above-captioned case would need to be addressed in the evidentiary hearing.

The Court then conducted an exhaustive evidentiary hearing on various days over a period of weeks beginning on April 12, 1991. The Court sets forth below in its opinion its findings of facts based on the testimony offered in the hearing held on April 12 and 24, 1991 and May 6 and 10, 1991.

## II. THE CONSENT DECREE.

The Consent Decree [3] entered by the parties to this case provides that:

> [i]mmediately upon the journalization of this Decree the Lorain Board of Education will begin to develop a plan by which the objectives outlined in the Goal Statement will be achieved ...

Consent Decree, Docket No. 76 at 2. The Consent Decree further provides that in the event the parties are unable to arrive on an approved plan within a specified number of days, then any party can petition the Court for the Court's intervention. *Id.* at 2–3. The Consent Decree sets forth the time at which the plan is to go into effect, and provides that the plan should consist of the creation of a seven member Board of Review to oversee the implementation of the plan approved by the Court. With respect to the funding of the Lorain desegregation plan, the Consent Decree provides that:

> The State of Ohio will pay to the Lorain City School District 50 percent of

the expenses incurred by the Lorain City School District in designing, implementing, administering and maintaining educationally sound programs reasonably expected to reduce racial isolation to the standards defined in the Goal Statement. The State of Ohio will pay 50 percent of the unreimbursed expenses attributed to the transportation of students who are being transported for the reduction of racial isolation. "Unreimbursed expenses" shall mean the portion of this expense which remains after deducting the state transportation reimbursement applicable to students involved in such transportation.

> The total of the expenses referred to above shall be limited to those incurred during the seven school years 1984–85 through 1990–91, and the State of Ohio payments shall not exceed $1 million during the seven year term, or 50 percent of the actual reduction of racial isolation costs, whichever is less.

*Id.* at 4–5.

The Consent Decree provides that "[t]his consent decree shall remain in effect until the goals which are a part of the decree have been achieved whereupon this decree shall expire." *Id.* at 5.

The Consent Decree also includes a section titled "Goal Statement" in which various goals sought to be achieved through implementation of a desegregation plan are set forth. The Consent Decree sets forth the following educational goals:

1. Eliminate racially identifiable schools, caused by student and/or teacher assignments, consistent with other goals of this Goal Statement.

2. Assign students to school attendance areas so that each school will establish a composite minority student ratio of no more than a deviation of + 20 or − 15 percent from the District Average percentage of each identifiable minority's student racial composition.

---

**3.** The Court will attach the Consent Decree as Appendix A of its Memorandum Opinion, but will reproduce pertinent sections within the body of its Opinion as well

3. The parties agree that the Lorain City School District shall retain an independent contractor to evaluate the bilingual programs currently in effect to determine program effectiveness. The cost of such evaluation shall be considered part of the cost of implementation of the Consent Decree and up to 50 percent of the cost shall be reimbursed by the State of Ohio as provided in Item No. 4 of the Consent Decree ...

4. Provide a mechanism by means of which students may transfer from their school of assignment to other schools, provided that the transfer does not adversely affect the racial composition of the sending or receiving school.

5. Assure that any student assignments or reassignments required to comply with the goals of this Decree will be carried out in a manner which equitably allocates the burdens on the students. Assure that any school closings which are necessary to comply with the terms of this Decree are carried out in a manner which equitably allocates the burden of such closings on the various neighborhoods of the City.

6. Student reassignments necessary to establish and maintain the percentages of non-white students in each building at the + 20 or − 15 percent level will be implemented in a manner that will ensure that whatever "burden" of movement there may be will be equitably shared by both non-white and white students. If any additional schools are closed, students from those schools shall be reassigned in a manner that ensures that each receiving school will have a composite minority student ratio of no more than a deviation of + 20 or − 15 percent from the district average percentage or [sic] minority students ...

*Id.* at 7–9 (emphasis added).

With respect to bilingual education in the Lorain City Schools, the Goal Statement provides that "the Lorain City School District shall retain an independent contractor to evaluate the bilingual programs current-ly in effect and to determine program effectiveness." *Id.* at 7. The Consent Decree further provides that the Lorain Board shall:

Eliminate program shortcomings discovered in the evaluation process and implement modifications.

(a) Maintain bilingual programs for Hispanic students.

(b) Comply with both federal and state bilingual statutes ...

(c) Assign non-, or limited-, English proficient students only to schools which are adequately staffed and equipped to meet their diagnosed lingual needs.

*Id.* at 8.

The Goal Statement portion of the Consent Decree also sets forth the affirmative action which should be taken with respect to employment opportunities in the Lorain City School District. Specifically, the Goal Statement indicates that particular hiring goals should be put in place. The Goal Statement of the Consent Decree provides in this respect that:

1. The HIRING GOAL shall be minority/majority ratio of the adult population in Lorain in the year of achievement.

2. The same goal shall apply to both Certificated and non-Certificated personnel at each level of responsibility within the school system.

3. The HIRING RATE for certificated teaching staff during the 1984–85 school year shall be 20% Black and 20% Hispanic. Provided, however, that the parties recognize that the Lorain District shall have an opportunity to demonstrate impossibility of achieving the Hispanic goal for reasons unrelated to good faith effort.

4. The HIRING RATE for certificated staff for all subsequent years shall be determined by the District, in light of the pertinent factors (number of vacancies, areas in which staff is needed, availability of qualified applicants, etc.)

5. The hiring rate for non-certificated staff shall be determined by the Dis-

trict, in light of such pertinent factors as are set forth in #4 above.

6. The Lorain District shall have five years during which to achieve the hiring goal as it relates to Blacks and seven years as it relates to Hispanics.

*Id.* at 13–14.

Following lodging with and acceptance by the Court of the Consent Decree, the parties began developing a desegregation plan to implement the goals of the Consent Decree.

## III. THE DESEGREGATION PLAN.

### A. *Formulation of the Plan.*

The parties attempted but were unable to reach an agreement on a plan which could be utilized to achieve the objectives of the Goal Statement as set forth in the Consent Decree. A significant dispute between the parties centered on Lorain's proposal to implement a magnet school program rather than employ a program of involuntary reassignment to bring the Lorain schools into compliance with the + 20/ − 15 ratio as to minority students as required by the Consent Decree. Plaintiffs wanted to implement a system of involuntary reassignment of students. Plaintiffs contended, *inter alia,* that a system of involuntary reassignment would be more efficient at achieving desegregation and would be less costly.

Finding that the parties were having difficulty agreeing on a desegregation plan, the Court elected to hold a hearing on the proposed desegregation plan. The Court began the evidentiary hearing on the matter on January 22, 1985. The Court then discovered that the parties were attempting to negotiate a resolution and so continued the hearing until March 6, 1985.

At the March 6, 1985 hearing, the Court received testimony and evidence on the proposed plan and heard arguments on the issues raised by the plaintiffs. The Court then issued a Memorandum Opinion and Order, (Docket No. 95), on April 1, 1985 both approving portions of the proposed plan and rejecting other portions of the proposed plan as is outlined below.[4]

The Court approved the Lorain Board of Education's proposed desegregation plan regarding the use of a magnet program to be put into effect at two schools for the 1985/86 school year. The Court rejected, however, the definition of success of the magnet program that was provided in Lorain's proposed plan[5] and held, instead, that the magnet program would only be deemed successful for the 1985/86 school year if the plan *achieved* the targeted ratios as set forth in the consent decree and not some lesser percentage.

The Court also approved Lorain's proposed plan as it related to enhancement and implementation of a bilingual program. The Court noted:

> The bilingual program is of extreme importance to the Hispanic students of the Lorain School District. The Lorain School District is composed of approximately 22.8% Hispanic students. However, the majority of the Hispanic students are located in the south Lorain schools. The bilingual program is currently in effect in the south Lorain schools. The proposed plan provides for

---

**4.** The Court noted in its April 1, 1985 Opinion that although the plaintiffs recognized that the Lorain Board of Education had made a good faith effort to comply with the requirements of the Consent Decree through its proposed desegregation plan, the plaintiffs still voiced the following objections to the proposed plan:

 1. The proposed use of magnet schools in the 1985/86 school year, as opposed to involuntary reassignment to reach the desegregation goal is inconsistent with the consent decree;

 2. A stringent review is necessary of the procedures regarding the discipline of students considering that a disproportionate number of black students have been suspended from the Lorain city schools;

 3. The Lorain Board of Education is not making a good faith attempt to achieve the goals of hiring minority teachers and staff employees for the school district;

 4. The board of review which is to be created pursuant to the consent decree is not given sufficient power to monitor the implementation of a desegregation plan.

*Id.*

**5.** Lorain had indicated in its proposed plan that success with regard to racial balance of students would be achieved if the program attained 60% of the critical target.

an extensive process by which the bilingual program currently in effect will be evaluated with the help of independent consultants. The Board of Education proposes an evaluation team submit a final report and recommendation regarding the bilingual program by May 20, 1985. The magnet program will not affect the south Lorain schools in the 1985/86 school year. The board of education asserts that postponing the desegregation process in south Lorain schools for the 1985/86 school year will allow the implementation of changes and recommendations regarding the bilingual program prior to the involuntary transfer of students. The board of education asserts that time is needed time [sic] to implement the upgraded bilingual program and the board does not want to involuntarily transfer students out of the south Lorain schools who may need the use of such a program.

Memorandum Opinion and Order, Docket No. 95 at 10–11.

The Court adopted the proposed plan with regard to the hiring of certificated and noncertificated personnel as well. The Consent Decree, as was indicated above, provides that the hiring goal for the Lorain City School District shall be the minority/majority ratio of the adult population in Lorain in the year of achievement. The Consent Decree further provides that the same goals shall apply to both certificated and noncertificated personnel at each level of responsibility within the school system. Likewise, the Consent Decree provides that the Lorain City School District shall have five years during which to achieve the hiring goals as to Blacks, and seven years as to Hispanics.

The Court found in its Memorandum Opinion and Order of April 1, 1985 that "the Lorain School District is making a good faith effort to reach the goals of the Consent Decree, i.e., having a minority/majority ratio for the teachers and staff of the Lorain City Schools which mirrors the adult population in Lorain and attaining such a goal in five years as it relates to Black teachers and seven years as it relates to Hispanic teachers." Accordingly, the Court accepted the provisions of the proposed plan as they related to achieving the hiring goals as provided in the Consent Decree. However, the Court noted that:

[t]o insure a continued good faith effort, the school district is to provide the Court with semi-annual reports regarding the efforts to attain the hiring goals of the Consent Decree. The School District is to provide the Court with a report prior to conducting teacher and staff recruiting for the following academic year period. The report is to thoroughly explain the method and extent of the recruitment and hiring expected for the following academic year. The second semi-annual report is to be presented to the Court following the completion of recruiting and hiring for an academic year. The second semi-annual report is to inform the Court of the actual recruiting techniques utilized and the result of such recruiting, with particular emphasis on minority and nonminority hiring.

*Id.* at 20. The Court noted further that "[s]uch reports will enable the Court to monitor the progress of the school district in attaining the hiring goals during the time period provided under the Consent Decree. Upon motion by any party, or on the Court's own motion, a hearing will be held regarding the school district's efforts to comply with the hiring goals in the Consent Decree." *Id.*

Following the adoption and the initial implementation of the Lorain desegregation plan, the Court continued to closely oversee the implementation of the desegregation plan and to assure that Lorain was meeting the requirements of the Consent Decree. The Court required that progress reports be submitted for the Court's review.[6]

The Court now moves on to make findings of fact regarding the implementation of the desegregation plan. The Court focuses specifically on the three following

---

**6.** A review of the extensive docket in this case evidences the Court's continued involvement in the implementation of the desegregation program in Lorain.

areas: 1.) the Composition of the student population in the Lorain City School District; 2.) the Bilingual Program, and 3.) the Hiring Goals.

### B. *Implementation of the Plan.*
#### 1. Composition of Student Population in Schools.

1. The Goal Statement of the Consent Decree entered in the above-captioned case provides that Lorain shall eliminate racially identifiable schools and that Lorain shall assign students to school attendance areas so that each school will establish a composite minority student ratio of no more than a deviation of + 20 or − 15 percent from the district average percentage of each identifiable minority's student racial composition. Consent Decree, Docket No. 76 at 7.

2. At the time the Consent Decree was entered into in the above-captioned case, six schools, Fairhome Elementary School, Hawthorne/Boone Elementary School, Lincoln Elementary School, Lowell Elementary School, Whittier Junior High School, and Southview High School, were out of compliance with the terms of the Consent Decree with respect to the composition of the minority student population. Transcript, Docket No. 401 at 594–95.

3. Former Superintendent of the Lorain City School District, John Pavic, originated the idea of utilizing magnet school programs as a means of coming into compliance with the terms of the Consent Decree. Transcript, Docket No. 394 at 481. Lorain proposed the use of a magnet school program as a method to achieve the student population ratios set forth in the Consent Decree. Lorain began with magnet programs in two of the buildings which were out of compliance, Fairhome Elementary School and Hawthorne/Boone Elementary, for the 1985–86 school year. Transcript, Docket No. 399 at 14. The magnet programs in these buildings proved successful. Accordingly, the Lorain magnet programs were expanded into other buildings to bring all schools into compliance with the student population ratios in the Consent Decree.

4. At present, all twenty-one buildings in the Lorain City School District are racially balanced within the limits outlined in the Consent Decree. Transcript, Docket No. 399 at 16.

5. At the time the parties entered into the Consent Decree in the above-captioned case and formulated the desegregation plan for achieving the goals of the Consent Decree, it was thought that it would be necessary to move approximately 650 students to achieve the requisite racial composition of the student population. Transcript, Docket No. 394 at 413. However, when Lorain actually began implementing its magnet desegregation program, it was discovered that Lorain in fact had to move in excess of 1200 students to maintain a viable desegregation program.[7] Lorain discovered that the movement of the bare minimum number of students to come into compliance with the terms of the Consent Decree would not result in long-term compliance in that if Lorain only moved the minimum number of students and one or two students left a particular school building, then the building would fluctuate in and out of compliance very frequently. Transcript, Docket No. 394 at 414; Transcript, Docket No. 401 at 599–600. The Court finds that Lorain needed to move more than the 650 students in order to have a viable long-term desegregation plan.

6. The original 650 number arrived at did not include students who needed to be moved for the purpose of bilingual education in the Lorain City School District. Transcript, Docket No. 401 at 600.

7. Lorain has expanded its magnet school program beyond the magnet programs *necessary* to achieve the goals of the Consent Decree in the above-captioned case.[8] Seventeen out of twenty-one schools

---

7. The Court notes that different figures were provided to the Court as to the precise number of students needed to be moved to achieve the requisite racial composition in the school district. Clearly, however, at least twice as many students needed to be moved than was originally envisioned would need to be moved under the Consent Decree.

8. The Court will refer to the magnet programs necessary to comply with the terms of the Con-

in Lorain currently have magnet programs. Transcript, Docket No. 401 at 645–46. The additional magnet programs in place in the Lorain City School District help Lorain to maintain desegregation in its school district but are not necessary for Lorain to maintain compliance with the terms of the Consent Decree with respect to composition of student population.[9] *Id.* at 615.

8. There are approximately 1300–1350 students involved in magnet programs necessary to remain in compliance with the terms of the consent decree, and approximately 2000 to 2200 students involved in the non-court ordered magnet programs.[10] Transcript, Docket No. 401 at 647. There are approximately 3500 students involved in magnet programs in Lorain out of a total student population in the District of about 12,300 students. Transcript, Docket No. 399 at 22; Transcript, Docket No. 401 at 648.

9. As is outlined below, the Palm Academy building is out of compliance with the racial balance set forth in the Consent Decree since it houses a large component of the bilingual program and necessarily has a high concentration of Hispanic students. However, the Court has given its approval for the bilingual program at Palm Academy to operate even though it results in an otherwise impermissible concentration of Hispanic students in one school building.[11]

### 2. The Bilingual Program.

1. The plaintiffs have taken the position since the inception of this litigation that they adequately represent all minority students in the Lorain City School District. However, it became apparent to the Court that the Hispanic students in the Lorain City School District and their parents believed that they were entitled to separate counsel to adequately represent their interests. The Court found that the Hispanics in Lorain are particularly concerned about the hiring of Hispanic individuals. Additionally, the Court found that the Hispanics are committed to the continuance and further development of an adequate bilingual program in the Lorain City School District and this interest in the bilingual program led to tension between counsel for plaintiffs and the Hispanics. Accordingly, on April 11, 1989, the Court recognized the Coalition for Hispanic Issues and Progress ("CHIP") as an intervening party and appointed Mr. Jose Feliciano of Baker & Hostetler to represent CHIP, (Docket No. 252). Since that date, the Hispanic interests have enjoyed separate representation.

2. The Consent Decree provides that the Lorain City School District shall retain an independent contractor to evaluate the bilingual programs currently in effect in Lorain to determine the effectiveness of said programs and shall also eliminate program shortcomings that may be discovered in the evaluation process and implement modifications. Consent Decree, Docket No. 76 at 7–8.

3. The evidence revealed that at the time the Consent Decree was entered, Lorain did have some bilingual education programs in place; however, Lorain did not have a core bilingual program in place and the programs that were in place were not meeting the special needs of Lorain's Hispanic student population. Transcript, Docket No. 401 at 691–93. That is, Lorain did not have a program in place which was effective at keeping language deficient students in school and mainstreaming such students into the regular student body.

4. Pursuant to the terms of the Consent Decree, an evaluation of Lorain's bilingual education program was conducted and the results lodged with the Court on August 9, 1985, (Docket No. 107).

5. After the evaluation of the bilingual program was conducted, Lorain developed a core bilingual program to meet the needs

sent Decree as court ordered magnets, and the additional magnet programs in place in Lorain as non-court ordered magnets.

**9.** The Court has been provided with separate figures for the costs of court ordered versus non-court ordered magnets.

**10.** As the Court noted in footnote 7 above, there was some variance in the figures provided to the Court as to the numbers of students participating in magnet programs.

**11.** *See,* Order, Docket No. 306.

of the Lorain City School District's language deficient students. Transcript, Docket No. 303 at 5. The bilingual program put in place is located in four different school buildings throughout the Lorain City School District. Each school houses a different component of the bilingual education program. The focus in the program is to provide students with effective English language instruction.

6. In the 1986–87 school year, Lorain reopened the Palm Academy school building which was closed at the time of the entrance into the Consent Decree. The Palm Academy building was reopened because Lorain needed a place to house the component of its bilingual program which involves the instruction of students who do not have any English-speaking skills. The component of the bilingual program housed at the Palm Academy school contains students grades kindergarten through sixth who need instruction in Spanish because they do not speak any English. Transcript, Docket No. 303 at 5. Palm Academy houses students who need extensive instruction in both their native language and in English. The bilingual program at Palm Academy uses a child's first language as an interim medium of instruction until the child acquires fluency in the second language. Status Report, Docket No. 358 at 10.[12]

7. Recognizing that by housing a major component of the bilingual program at the Palm Academy building, the building would necessarily be out of compliance with the percentages mandated by the Consent Decree, Lorain opened a magnet program in the Palm Academy building. The magnet program in the Palm Academy building is a Montessori program involving Caucasian, Black, and Hispanic students. Transcript, Docket No. 303 at 5–6.

8. The Court finds that bilingual programs in general are race selective in that in order to be successful, such programs involve a high concentration of, for instance, Hispanic students in one location.

9. In an Order dated April 11, 1990, (Docket No. 306), the Court modified the Consent Decree so as to exempt Palm Academy from the requisite racial balance of the Consent Decree only to the extent that the racial imbalance is caused by the presence of the bilingual program at Palm Academy. The Court ordered that all other programs at Palm Academy except for the component of the bilingual program must remain in compliance with the racial balance stipulated to in the Consent Decree. The Montessori Program at Palm Academy is racially balanced. Transcript, Docket No. 303 at 6.

10. The other components of the bilingual program other than that located at Palm Academy are located at Meister Elementary School, Longfellow Junior High School, and Southview High School. The component of the bilingual program at Meister Elementary School includes students who already have some degree of English proficiency but not enough to function successfully in the mainstream classroom. The program at Meister continues to develop the English language skills which the students already have. The native language is used only for checking comprehension and/or tutoring as needed. Grades kindergarten through second are in self-contained classrooms with a bilingual teacher and a bilingual teacher aide. Grades three through six are organized as a pull-out English as a Second Language ("ESL") program. Students in grades three through six at Meister follow the regular schedule of the mainstream classroom with some modifications.

A high intensity language training center for grades seven through eight is offered at both Longfellow Middle School and Southview High School. This program is for students who are identified as monolingual speakers of a language other than English or as limited English-proficient students. Bilingual teachers and bilingual teacher aides work with the students in the ESL classroom. Students are mainstreamed in regular classrooms for many

---

12. The Court has attached as Appendix B to its Opinion the Status Report on Desegregation of the Lorain City Schools issued on January 29, 1991.

subjects. Status Report, Docket No. 358 at 11.

11. The Court finds that Lorain's bilingual program has been successful in terms of meeting the needs of language deficient students in the Lorain City School District. Lorain has been successful in mainstreaming bilingual students. The overall test scores of bilingual students have improved as a result of the implementation of the bilingual program as it now exists in Lorain. In the 1990–91 school year, thirteen students from the bilingual program will graduate in Lorain. Transcript, Docket No. 401 at 611. Prior to the implementation of a cohesive core bilingual program, Lorain had difficulty keeping bilingual students in school.

### 3. Hiring Goals.

1. The Goal Statement of the Consent Decree provides that the hiring goal in place in the Lorain City School District shall be the minority/majority ratio of the adult population in Lorain in the year of achievement. The Consent Decree further provides that the Lorain City School District shall have five years during which to achieve the hiring goal as it relates to Blacks and seven years as it relates to Hispanics. Consent Decree, Docket No. 76 at 13–14.

2. Lorain's affirmative action goal in terms of hiring pursuant to the Consent Decree is 12% Black and 14% Hispanic since these are the percentages of adult minorities in the population of the City of Lorain.

3. The Lorain City School District has submitted to the Court annual status reports on its progress under the desegregation plan in place in Lorain. In its most recent report filed with the Court on February 4, 1991, (Docket No. 358), Lorain provided the Court with a report on the progress of the Lorain City School District in meeting its affirmative action goals. The report indicates that Lorain has not as yet met its hiring goals under the Consent Decree. The recent status report indicates

that as of December 31, 1990, Lorain had 873 professional employees of which 86, or 9.9%, were Black and 68, or 7.8% were Hispanic; Lorain had 632 classified employees of which 91, or 14.4%, were Black and 106, or 16.8%, were Hispanic. Status Report, Docket No. 358.[13]

4. The Court finds that Lorain has made a continuous and good faith effort toward achieving the hiring goals in the Consent Decree. In a hearing conducted on February 20, 1987, the Court heard testimony regarding the efforts Lorain had made up to that point toward achieving the hiring goals in the Consent Decree. The testimony revealed that Lorain advertised for positions at many colleges and universities. Lorain sent vacancy notices to the colleges and universities and sent a monthly posting to the Minority Affairs Office of the colleges and universities. Lorain flew in or paid for the transportation costs of any minority applicants who were willing to travel to Lorain for interviews. Lorain also became a part of the Ohio Minority Recruitment Consortium which is a group of about sixteen to eighteen school districts in Ohio that have an active commitment to minority recruitment. Lorain also trained its recruiters. Transcript, Docket No. 174 at 22–24.

5. Lorain indicated in its most recent status report to the Court that it employed the following recruitment procedures during the 1990–91 school year. Lorain had an "open interview" practice until the staffing for the 1990–91 school year was completed. Under the "open interview" practice, a teacher applicant was granted an immediate interview by the School District's personnel office. Advertisements announcing the "open interview" practice were placed in the Sunday editions of both the *Plain Dealer* and the *Akron Beacon Journal* through August of 1990. The Personnel Office in Lorain continued to conduct interviews when employment vacancies occurred. When vacancies occurred during the school year, minority applicants whose

---

**13.** The Court notes that Lorain is progressing toward achievement of its hiring goals. At the point at which Lorain achieves the hiring goals, it now appears that the Court's supervision over the Lorain City School District will be complete.

names were pulled from the data bank maintained by Lorain's Personnel Office were contacted.

Lorain still reimburses minority applicants for travel expenses if they come from out of state to interview. Professional staff of the Lorain City Schools continue to interview teacher candidates both at colleges within Ohio and in locations outside of Ohio where there are significant numbers of minority teaching candidates. The staff members participating in the recruitment efforts are provided with training. Lorain has continued its participation in the Ohio Minority Recruitment Consortium. Likewise, Lorain advertised for positions in the *Black Employment Education Journal* and the Spanish language newspaper *El Dia Nuevo.*

Lorain has established contacts with the Lorain NAACP and Centro de Servicios Sociales Para La Communidad Hispana to develop procedures to welcome minority applicants to the Lorain community. Likewise, Lorain has entered into discussions with representatives of these community organizations to find ways to recruit more minority persons into the Lorain community. Lorain has also developed plans to target recruitment efforts for the 1991–92 school year in urban areas where large numbers of minority teachers are employed.

6. Lorain has made a continued and good faith effort at achieving the hiring goals. Lorain's inability to achieve the hiring goals set forth in the Consent Decree has not been a result of any delinquency or inaction on the part of Lorain. Instead, Lorain's inability to meet the hiring goals has been a result in great part to several factors outside of Lorain's control. One major factor is Lorain's inability to compete with school systems with more competitive salaries. A second factor is the location of the Lorain City School District. The Court finds that it is difficult to interest out of state applicants into coming to

Lorain, Ohio, especially when salaries are not highly competitive. Third, the Court finds that it is difficult to find minority applicants to fill certificated positions when the need arises.

## IV. THE GROWING FINANCIAL CRISIS IN THE LORAIN CITY SCHOOLS.

1. In an application for federal grant money for its magnet programs dated November 6, 1986, Lorain indicated that an independent audit which had just been performed revealed that of the $2,000,000 pool for the Lorain desegregation plan, $600,-000, or 30% of the total amount designated for a seven year period, was utilized during the period of August 1984 to December 1985. Ohio Department of Education, Hearing Exhibit 11 at 26–27. Lorain indicated that this amount of money was spent when the transportation costs for the magnet programs were relatively minimal in that only two magnets were in place in 14 classrooms impacting 300 students.

2. The total cost for Lorain's court ordered magnet programs for the 1989–90 school year was $5,201,834.00.[14] The estimated total cost for Lorain's court-ordered magnet programs for the 1990–91 school year is $5,446,353.00. *see,* Appendix C to the Court's Opinion.

3. The estimated total cost for the non-court ordered magnet programs in place in Lorain for the 1990–91 school year is $1,700,486.00.[15]

4. By the third year of Lorain's magnet desegregation program, the $2,000,000.00 allocated for the seven year period of the desegregation plan was spent and Lorain was supporting much of its magnet program through general funds. Transcript, Docket No. 394 at 418.

5. To effect its magnet desegregation program Lorain had to add many additional employees. *Id.* at 421. Lorain had to add a desegregation specialist as well as addi-

---

**14.** Attached as Appendix C to the Court's Opinion is a summary of the costs of Lorain's court-ordered magnet programs broken down by category.

**15.** Attached as Appendix D to the Court's Opinion is a summary of the costs of Lorain's non-court ordered magnet programs broken down by category.

tional administrators, teachers and clerical persons. Lorain employed 692 teachers in 1984. Lorain employed 804 teachers after implementation of its magnet program. Transcript, Docket No. 402 at 826.

6. In order to attempt to achieve the hiring goals under the Consent Decree, Lorain had to increase salaries so that it could be competitive in the job market and attract minority applicants. *Id.* at 421–22.

7. Lorain has received about $3,400,-000.00 in federal grant money for its magnet programs. *Id.* at 434. Lorain's last grant was received in fiscal year 1990. Transcript, Docket No. 386 at 167.

8. The Lorain City School District's total property tax valuation for the tax year 1989 was $469,223,128.00 consisting of agricultural, residential, industrial, commercial, public utility, personal property and railroad. Transcript, Docket No. 399 at 30. Lorain has 3.44 millage within the 10 mill limitation, voter approved, 28.20 outside (the ten mill limitation) millage on a continuing basis. Under Ohio law, voters in the school district may adopt millage on a continuing basis or on a fixed term emergency basis. Lorain has in place a 7.45 emergency five-year levy. The final year of collection of the five-year levy is 1992. Lorain also has in place a 7.50 emergency three-year levy. The last year of collection for that voted levy is 1991. A failure by the Lorain voters to renew the two emergency levies totaling 14.95 millage will create even more serious financial problems for the district and the implementation of the desegregation order. *Id.* at 3031.

9. Lorain has the lowest tax value per pupil out of the five major Ohio cities under desegregation orders. Lorain's tax value per pupil is about $39,908.00 while Cleveland's is $56,660.00, Dayton's is $56,-928.00, Cincinnati's is $78,330.00 and Columbus' is $82,871.00. Lorain Board of Education Exhibit 5002. Lorain ranks about 408th out of about 612 school districts in Ohio in tax value per pupil. Transcript, Docket No. 386 at 177.

10. Lorain's local tax rate is 53rd in the State. Transcript, Docket No. 386 at 176. When Lorain's local support is combined with its property tax valuation, it is found that the District is voting millage above the State average, but is still not able to generate enough dollars to support its programs since the property base is so low. *Id.* at 177.

11. Several years ago Lorain elected to become involved in an early retirement program. The Early Retirement Incentive ("ERI") program was a negotiated portion of a collective bargaining agreement. Transcript, Docket No. 394 at 459. Lorain entered into the ERI program as a way to save money in the long-term by replacing teachers on the high end of the salary scale with teachers at the lowest end of the pay scale. Lorain also entered into the ERI program as a way to free up positions so that they could be filled by minorities and Lorain could work toward achieving its affirmative action goals under the Consent Decree. *Id.*

ERI's have certain up front costs since a school district must buy out the existing contracts. However, ERI's are cost effective in the long-term. The school district involved in an ERI must make payments to the State Teachers Retirement System ("STRS") on behalf of those persons agreeing to retire early. *Id.* at 460.

The costs of the ERI program are determined by the STRS. Transcript, Docket No. 401 at 748. The costs are based on actuarial tables provided to participating school districts by the STRS. In the early days of ERI programs, simple actuarial accounting was utilized and the ERI programs were a good deal for school districts. However, recently the costs of the ERI program have skyrocketed due to changes made in the actuarial tables by the STRS.

Lorain discovered that if all persons eligible to take advantage of the ERI were to take advantage of it in the Spring of 1991, Lorain would have to pay out $9,387,-460.00.[16] Recognizing the potentially dev-

---

**16.** Attached as Appendix E to the Court's Opinion is a summary of the ERI costs to Lorain and a description of the ERI program.

astating effect of the ERI, Lorain met with the teachers union and the administrators association in October of 1990 and negotiated a new contract to begin in August of 1991. As part of this bargain, the teachers association and administrators association and Lorain agreed that anyone who was planning to elect to take the ERI had to make him or herself known by a date certain. The contract entered into by Lorain is less costly than the ERI program would have been had all persons eligible for early retirement taken the option. Transcript, Docket No. 401 at 762. Twenty-four teachers and two administrators are retiring under the ERI in fiscal year 1991 at a cost to Lorain of $2,972,915.00. Transcript, Docket No. 401 at 752; *see*, Appendix E to the Court's Opinion.

12. Lorain's contract with its teachers that runs from August 1, 1988 until August 31, 1991 provided for a ten percent pay increase in January of 1990 and a 6.5 percent pay increase in August of 1990. Transcript, Docket No. 401 at 765. The newly negotiated three-year teachers' contract to go into effect in August of 1991 provides for raises of five percent for each year beginning in August of 1991. The contract also provides for the option of cashing in an increased number of sick days. In addition, the contract provides for additional steps at the top of the pay scale. *Id.* at 767.

13. Lorain's average teacher salary for fiscal year 1991 is $34,259.00 compared to an average teacher salary in the State of Ohio which is $32,053.00. Transcript, Docket No. 386 at 178. Lorain's average teacher salary is second in the county, second by type of district, and 93rd in the State. *Id.*

14. In school year 1989–90, the average teacher salaries in the major Ohio cities involved in desegregation programs were as follows: 1.) Cleveland—$34,465.00; 2.) Columbus—$32,450.00; 3.) Cincinnati—$32,487.00; 4.) Dayton—$31,155.00, and 5.) Lorain—$29,256.00.

15. It is projected that Lorain will pay approximately 97.5% of its total revenue for salaries and fringe benefits in fiscal year 1991. Transcript, Docket No. 386 at 159.[17] The average school district spends about 84 to 85% of its general operating funds on salaries and fringe benefits. *Id.*

16. Lorain made numerous reductions and cuts in its budget in the face of its financial crisis. Lorain, *inter alia*, cut the hours of library aides, monitors, and magnet teacher aides, made changes in transportation, made cuts in textbook adoptions, and cut out a math program. Transcript, Docket No. 401 at 727. The Board made cuts in its own budget, and overtime was reduced. *Id.* at 727–28. These cuts, made in December of 1990, resulted in over $963,000.00 in savings. *Id.* at 728. All but about $200,000.00 worth of these cuts are permanent. *Id.*

A second round of cuts were made in February of 1991. On February 6, 1991, Lorain eliminated Spring activities and sports programs. Lorain also eliminated the need for night custodians, and started a policy whereby classrooms are cleaned only every other day. These cuts resulted in a savings of $1,066,000.00. *Id.* at 728–29.

In April of 1991 Lorain decided to make the following additional cuts effective July 1, 1991. Lorain will close Harrison Academy at a savings of about $73,000.00, and will close the administrative building at an approximate savings of about $150,000.00 per year. By closing these buildings Lorain will save over $700,000.00 in repair work that would be necessary were the buildings to remain open. Lorain will reorganize the Hawthorne/Boone school at a savings of $318,000.00; Lorain will also change some school buildings around. Lorain will make a reduction in support staff of over $760,000.00 and also a reduction in transportation costs of $275,000.00. Lorain will save $258,000.00 by reducing six administrators. *Id.* at 732.

Lorain has made total reductions in spending this year in the amount of $3,862,-

17. Attached as Appendix F to the Court's Opinion is a State of Ohio, Department of Education, Projection of Revenue and Expenditures and Balances for the Lorain City School District, Lorain County (SM–5) dated March 20, 1991 and March 21, 1991.

000.00, and only $286,000.00 of the reductions are one time only savings. *Id.*

## V. FACTUAL BACKGROUND LEADING TO THE STATE'S AGREEMENT TO PAY 50% OF THE COSTS OF THE LORAIN DESEGREGATION PLAN UP TO A CAP OF $1,000,000.00.

1. The Consent Decree provides that the State of Ohio will pay to the Lorain City School District 50% of the costs of the Lorain Desegregation Plan up to a cap of $1,000,000.00. Consent Decree, Docket No. 76 at 4.

2. The last payment by the State of Ohio to Lorain for purposes of the desegregation plan was made in fiscal year 1988. Transcript, Docket No. 386 at 167.

3. Dr. G. Robert Bowers, former Assistant Superintendent of Public Instruction in the Ohio Department of Education, was involved in all of the desegregation cases in the State of Ohio involving the State Department of Education, including the Cleveland, Columbus, Dayton, and Cincinnati cases.[18] Dr. Bowers was the representative for the State of Ohio in the Lorain desegregation case. Dr. Bowers advised Dr. Pavic, then Superintendent of the Lorain City School District, to settle the Lorain desegregation case since Dr. Bowers felt that if the case went to trial the defendants would be found liable for discrimination. *Id.* at 87; Transcript, Docket No. 394 at 406.

4. In the Cleveland, Columbus and Dayton cases, the school systems were found liable and the State of Ohio was ordered to pay 50% of the costs of implementing the desegregation plans stemming out of those cases.

5. As testified to by Dr. Bowers, the State of Ohio has never challenged at an appellate level a district court's order following a finding of discrimination that the State of Ohio must bear 50% of the costs of implementation of a desegregation plan. Transcript, Docket No. 383 at 50–51.

6. Dr. Bowers proposed to Dr. Pavic that the State contribute 50% of the desegregation costs up to a cap of $1,000,000.00. Transcript, Docket No. 383 at 28. Neither Superintendent Pavic nor the Lorain City School District had previous experience in a desegregation lawsuit. Transcript, Docket No. 394 at 407–408. Bowers' $1,000,000.00 proposal was not negotiated; rather, the State, through Dr. Bowers, offered that amount to Lorain and Lorain accepted the $1,000,000.00. Transcript, Docket No. 394 at 411.

7. Dr. Bowers used the earlier settlement agreement entered in the Cincinnati desegregation case as a model for the State's settlement proposal in Lorain. Transcript, Docket No. 383 at 28.

8. Following intense negotiations between the State and the Board of Education for Cincinnati which included the involvement of then Governor Rhodes, the State agreed to contribute $35,000,000.00 toward the desegregation costs in the Cincinnati case. At the time the Consent Decree was entered in the Cincinnati case, Cincinnati was already transporting 14,000 students in the magnet school program designed to bring about the integration of the student population. Under the terms of the Consent Decree, Cincinnati agreed to increase the magnet school student population to 20,000. The State's contribution of $35,000,000.00 was related to transportation and capital costs involved in increasing the student population in the magnet school program. The $35,000,000.00 State contribution was to be used to achieve the movement of between 14,000 to 20,000 pupils or an average of 17,000 pupils in order to effect the terms of the Cincinnati Settlement Decree. Transcript, Docket No. 383 at 58.

9. Dr. Bowers proposed the State's contribution of $1,000,000.00 in the Lorain case

---

**18.** *See, Reed v. Rhodes,* 422 F.Supp. 708, (N.D.Ohio 1976), *modified,* 607 F.2d 714 (1979) *cert. denied,* 455 U.S. 1018, 102 S.Ct. 1713, 72 L.Ed.2d 135 (1982); *Columbus Board of Ed. v. Penick,* 443 U.S. 449, 99 S.Ct. 2941, 61 L.Ed.2d 666 (1979); *Dayton Board of Education v. Brinkman,* 443 U.S. 526, 99 S.Ct. 2971, 61 L.Ed.2d 720 (1979); *Bronson v. Bd. of Ed. of Cincinnati,* 604 F.Supp. 68 (S.D.Ohio 1948).

because he determined that somewhere between 500 and 650 students would be involved in Lorain to achieve compliance with the Consent Decree's + 20%/ − 15% mandate in comparison with the 14,000 to 20,000 students in the Cincinnati magnet school program. Using the median of 17,000, Dr. Bowers construed the comparison to constitute a ratio of 35 to 1. Those calculations formed the basis for Dr. Bowers' proposal that the State's 50% participation in the desegregation costs in Lorain be capped at $1,000,000.00. *Id.* at 28.

10. The enrollment in the Lorain City School District is approximately 12,300 students. The enrollment in the Cincinnati Public Schools is approximately 51,110.

11. The Court finds that the ratio utilized by Dr. Bowers to arrive at the $1,000,000.00 figure was faulty in that the testimony and evidence at the hearing in this case revealed that Cincinnati was already moving 14,000 students in magnet programs which were implemented prior to the entrance into the Cincinnati settlement agreement. Thus, the State's contribution was only going toward the start-up costs for involving an additional 6,000 students in the program. Likewise, as was outlined above, it was necessary to move greater than the 650 students it was originally thought would need to be moved in Lorain to effect compliance with the terms of the Lorain Consent Decree. Accordingly, the ratio used to justify the $1,000,000.00 cap was not realistic nor supported factually.

12. The State envisioned that one half of the $1,000,000.00 would go towards creation or start-up costs of magnet programs and the other half of the $1,000,000.00 would go towards transportation of students involved in the magnet programs. Transcript, Docket No. 383 at 59.

13. For fiscal years 1983 through 1990, the State of Ohio Department of Education has contributed the following amounts to the desegregation programs in the following cities: 1.) Cincinnati—$35,000,000.00 plus $543,628.56 in plaintiffs' attorney's fees; 2.) Cleveland—$213,372,782.67 plus $1,425,880.93 in plaintiffs' attorney's fees; 3.) Columbus—$41,654,210.00 plus $753,458.01 in plaintiffs' attorney's fees; 4.) Dayton—$29,516,508.00, and 5.) Lorain—$1,000,000.00 plus $60,078.15 in plaintiffs' attorney's fees.[19]

14. Neither Superintendent Pavic nor the Lorain School District had ever been involved in a desegregation lawsuit prior to the present case. Transcript, Docket No. 394 at 407–408. The State, as was stated above, had been a defendant in several desegregation cases and had recently been involved in the Cincinnati settlement.

15. Prior to implementation of its magnet program as a means of complying with the Consent Decree, Lorain had little knowledge of what is involved in starting and implementing a magnet program. In particular, Lorain did not understand or comprehend the magnitude of the costs of implementing a magnet desegregation plan. *Id.* at 476.

16. Lorain's commitment to the magnet school program as the means to comply with the Consent Decree has produced a successful desegregation program in that the magnet schools have produced a stabilization of the school population, both numerically and racially. Likewise, Lorain's commitment to achieving the hiring goals in the Consent Decree has resulted in a steady increase in the hiring of minorities for both the certificated and noncertificated staffs. The highly successful desegregation program in Lorain has cost a great deal more than it was originally thought the program would cost. The underlying premise of the State's agreement to pay 50% of the desegregation costs in Lorain was that the costs would not exceed $2,000,000.00. That premise was not realistic as Lorain's experience has demonstrated.

## VI. LAW AND DISCUSSION.

### A. *Statement of the Applicable Law.*

■ The Court now turns to a discussion of the law regarding a court's authority to

---

19. Attached as Appendix G to the Court's Opinion is a summary of the State of Ohio's share of desegregation expenses for fiscal year 1983 through fiscal year 1990 in the Cleveland, Cincinnati, Columbus, Dayton and Lorain City School Districts.

modify a consent decree. The Sixth Circuit explained in *Stotts v. Memphis Fire Department*, 679 F.2d 541 (6th Cir.1982), *rev'd on other grounds*, 467 U.S. 561, 104 S.Ct. 2576, 81 L.Ed.2d 483 (1984), that a "consent decree is essentially a contractual agreement subject to continued judicial policing." *Id.* at 556. The Sixth Circuit further explained that "[t]he terms of the decree, unlike those of a simple contract, have unique properties. A consent decree has attributes both of a contract and of a judicial act." *Id.* (citations omitted).[20] A trial court always has continuing jurisdiction to enforce a consent decree as written. *Id.* at 557. Likewise, a "trial court has continuing jurisdiction to modify a decree should its operation become unreasonable." *Id.* (citations omitted).

The traditional test to determine whether a trial court can rightfully modify a consent decree was set forth by the Supreme Court in *United States v. Swift & Co.*, 286 U.S. 106, 52 S.Ct. 460, 76 L.Ed. 999 (1932), an antitrust case which was resolved through a consent decree. In *Swift*, the Supreme Court noted that "[a] continuing decree of injunction directed to events to come is subject always to adaptation as events may shape the need." *Id.* at 114, 52 S.Ct. at 462 (citations omitted). Thus, the Supreme Court recognized that a trial court does indeed have the power to modify a consent decree. The Supreme Court proceeded, however, to formulate a stringent standard for determining whether a modification of a consent decree is warranted in a particular case. The Court stated in this respect that:

> [n]othing less than a clear showing of grievous wrong evoked by new and unforseen conditions should lead us to change what was decreed after years of litigation with the consent of all concerned.

*Id.* at 119, 52 S.Ct. at 464.

Though cognizant of the stringent *Swift* standard for modification of consent decrees, several courts have begun to develop a less stringent standard for modification of consent decrees entered into in institutional reform litigation as opposed to litigation involving private individuals such as were involved in the *Swift* case. In *Heath v. DeCourcy*, 888 F.2d 1105 (6th Cir.1989), the Sixth Circuit considered the appropriate standard for modifying a consent decree entered into by agreement of the parties in the context of institutional reform litigation. *Id.* at 1106. In that case, a group of inmates sued under 42 U.S.C. § 1983 challenging the conditions of their confinement in a county jail in Hamilton County. The suit was resolved through the entrance into a consent decree. When the jail population began to exceed the capacity of the facility, the inmates sought to hold the county in contempt of the consent decree and the county moved to modify the consent decree.

The district court granted the county's motion in part, observing that "[t]he modification was 'mandated by common sense as it does not increase risk to the inmates and permits more effective utilization of the government's resources...., thereby promoting the public interest of having reasonable and lawful sentences served.'" *Heath v. DeCourcy*, 888 F.2d at 1108. In granting the motion to modify the consent decree, the district court in *Heath* relied on a prior Sixth Circuit case, *Stotts v. Memphis Fire Dep't*, 679 F.2d 541 (6th Cir. 1982), in which the Sixth Circuit stated that

> a consent decree can be modified (1) when done in accordance with basic principles of contract law, (2) when the decree is void or no longer equitable, or (3) when the circumstances of the case change.

*Heath*, 888 F.2d at 1108 (citing *Stotts*, 679 F.2d at 560–61). The inmates appealed the district court's ruling.

The Sixth Circuit affirmed the district court's decision and held that the district court did not err in applying the standard set out in *Stotts v. Memphis Fire Dep't.*, 679 F.2d 541 (6th Cir.1982), *rev'd on other*

---

**20.** The Sixth Circuit noted in *Brown v. Neeb*, 644 F.2d 551 (6th Cir.1981), that "[a] consent decree is a strange hybrid in the law. It is a contract that has been negotiated by the parties. It is also a court order which can be changed by a court if circumstances warrant." *Id.* at 557

*grounds,* 467 U.S. 561, 104 S.Ct. 2576, 81 L.Ed.2d 483 (1984), for modifying a consent decree. The Sixth Circuit noted that applying a flexible standard in modifying consent decrees is more appropriate in the context of institutional reform than in the context of consent decrees between private parties because, unlike consent decrees between private parties, the effect of institutional consent decrees reaches beyond the immediate parties and impacts on the public's right to the sound and efficient operation of its institutions. With respect to consent decrees arising out of institutional reform litigation, the Court in *Heath* observed that

> [b]roader judicial discretion to modify the parties' agreement is required so that the agreed upon solution to the problem giving rise to the litigation may be fine-tuned to accomplish its goal. The efficacy and consequences of a decree directing institutional reform cannot be seen clearly from the courtroom. Time and experience may yield new knowledge that compels modification of the original agreement [in order to accomplish its end].

*Heath v. DeCourcy,* 888 F.2d at 1109.

 Accordingly, the Sixth Circuit held that "in the area of institutional litigation, consent decrees arrived at by mutual agreement of the parties involved are subject to a lesser standard of modification than that dictated by *Swift.*" *Heath v. DeCourcy,* 888 F.2d at 1110. The Court explained that to modify such consent decrees,

> the Court need only identify a defect or deficiency in its original decree which impedes achieving its goal, either because experience has proven it less effective, disadvantageous, or because circumstances and conditions have changed which warrant fine-tuning the decree....

*Id.* The Sixth Circuit indicated that " '[a] consent decree may ... be modified where a better appreciation of the facts in light of experience indicates that the decree is not properly adapted to accomplishing its purposes.' " *Id.* at 1108 (quoting *Chance v.*

*Board of Examiners,* 561 F.2d 1079, 1086 (2d Cir.1977)).

The Sixth Circuit further elaborated that the less stringent standard "will require the trial court to balance the interest in preserving consent decrees entered into by agreement between private parties against the public interests sought to be achieved through modification of the decree." *Id.* at 1110. The Court noted, however, that:

> this standard is not inconsistent with *Swift,* since in the area of commercial consent decrees—which typically involve primarily private, not public, interests— any public interest in modifying the decree will ordinarily be less than the interest in honoring and preserving the private business arrangements established by the decree. Conversely, the public interest in modifying institutional consent decrees—which typically involve significant public interests—will ordinarily outweigh the interest of preserving the decree where sufficient reason for modification is shown.

*Id.*

This less stringent standard for modification of consent decrees in institutional reform cases has been applied by other Circuit courts as well. *Heath,* 888 F.2d at 1109. The Fourth Circuit applied a less stringent standard in *Plyler v. Evatt,* 846 F.2d 208 (4th Cir.1988), *cert. denied,* 488 U.S. 897, 109 S.Ct. 241, 102 L.Ed.2d 230 (1988), a prison reform case in which the State of South Carolina sought modification of a consent decree to allow double celling of prisoners. *Id.* at 210. The Fourth Circuit noted in *Plyler* that a strict standard for modification is "inappropriate in institutional reform litigation for 'the unique nature and demands of institutional reform litigation necessitate a more flexible approach to modification.' " *Id.* at 212 (citations omitted). The *Plyler* Court noted as well that "a consent decree may be modified in response to material changes in operative law or facts ... [and an] unanticipated increase in [prison] population clearly is a change in operative facts which

meets this predicate for modification." *Id.* at 211.[21]

The Court notes that the case before it is one involving school desegregation and not prison reform. However, the Court is convinced that the standard for modification of a consent decree set forth in the *Heath* opinion applies equally to the modification of a consent decree stemming out of a desegregation lawsuit.[22] In *Brown v. Bd. of Education*, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955), the Supreme Court stated with regard to remedies in school desegregation cases that "[i]n fashioning and effectuating the decrees, the courts will be guided by equitable principles. Traditionally, equity has been characterized by a practical flexibility in shaping its remedies and by a facility for adjusting and reconciling public and private needs." *Id.* at 300, 75 S.Ct. at 756. The Supreme Court also made reference to the interests at stake in school desegregation lawsuits: 1.) the "personal interest of the plaintiffs in admission to public schools as soon as practicable on a nondiscriminatory basis[;]" and 2.) the public interest in the elimination of obstacles in the way of the operation of a constitutional school system. *Id.*

The myriad of desegregation lawsuits in this country following the landmark Supreme Court case of *Brown v. Bd. of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), have demonstrated the strong commitment in this country to public education free from any forms of discrimination. The Court is of the view that desegregation lawsuits, like prison reform suits, are lawsuits in which the public has a vested interest and which involve interests beyond those of the individual litigants.

Development and implementation of a desegregation plan will necessarily involve trial and error. A consent decree covering desegregation of a school district must be capable of being modified in certain circumstances so that the important purpose of the consent decree, the elimination of any and all vestiges of discrimination in the school system, can be accomplished. To the extent the purpose of the consent decree is being frustrated, the Court must have the power to modify the consent decree so that the purpose can be achieved.[23]

---

**21.** *See also Badgley v. Santacroce*, 853 F.2d 50 (2d Cir.1988) (court stating that "[t]hough some measure of flexibility is warranted in considering modification of consent decrees in the context of institutional reform ... the guiding principle ... is that modification is favored when necessary to carry out the purposes of the original decree"); *Newman v. Graddick*, 740 F.2d 1513 (11th Cir.1984) (court stating that "[w]here, however, a consent decree involves the supervision of changing conduct or conditions and is therefore provisional, modification may be more freely granted"); *Philadelphia Welfare Rights Organization v. Shapp*, 602 F.2d 1114 (3d Cir.1979), *cert. denied*, 444 U.S. 1026, 100 S.Ct. 689, 62 L.Ed.2d 660 (1980) (court stating that when participants have made a good faith effort to meet the obligations of a consent decree "and the object nevertheless has not been fully achieved, clearly a court of equity has power to modify the injunction in light of experience").

**22.** The Court finds persuasive the reasoning that while institutional reform litigation is not a homogeneous category, "institutional reform decrees do share certain characteristic features." Comment, *The Modification of Consent Decrees in Institutional Reform Litigation*, 99 Harv. L.Rev. 1020, 1033 (1986). Consent decrees in institutional reform litigation have the three following traits in common: 1.) The speculative

and complex quality of the relief; 2.) The role of the government as an original defendant, and 3.) The effects on nonparties to the litigation. *Id.* at 1033–1037.

The present case certainly involves these characteristic traits. The remedy chosen to meet the terms of the Consent Decree was speculative in that the parties had a general idea of how the desegregation plan would work but were unsure of specifics in terms of numbers of students involved and ultimate costs. Likewise, the remedy in this case is complex. There are a myriad of factors to consider which at times conflict with one-another such as the interest in desegregated schools versus the interest in providing quality bilingual education.

In addition, the remedy selected in this case definitely has effects beyond just the parties to the litigation. The entire community of Lorain is affected by this litigation and the resolution of the litigation. There are definitely additional costs associated with desegregation of a school system. Local dollars necessarily will be used to support the additional costs. Likewise, a desegregation remedy can impact the quality of education offered in a particular school system both negatively and positively.

**23.** The Court is of the view that a more flexible standard of modification of consent decrees should be applied in institutional reform cases.

The Court certainly recognizes the interest of litigants in having the consent decree which they enter into enforced as written. The Court is equally aware of the argument that if courts begin modifying consent decrees, litigants will be deterred from entering into settlement agreements for fear the agreements will later be reopened and the obligations be increased. The Court notes in this regard, however, that the *Heath* standard, though not as stringent as the standard enunciated in *Swift, supra,* is still a difficult standard to meet. Indeed, the Sixth Circuit set forth the circumstances under which a court may order a modification and indicated that modification should only be ordered by a district court following specific findings which demonstrate that modification is warranted. The *Heath* opinion in no way indicated that modification is lightly to be awarded.

The Court is of the view that modification in certain extraordinary circumstances will not deter parties from entering into settlements. The Court notes that if courts did not have the power to modify consent decrees then parties might be deterred from entering into settlements since they might fear that unforeseeable events would occur which would necessitate a modification of the consent decree but that a court would be unwilling to order such a modification.[24]

As one commentator correctly pointed out, "This more flexible standard carries several advantages." Comment, *supra,* at 1037. A more flexible standard would "allow judges to respond—without resorting to doctrinal manipulation—to the kinds of problems that seem characteristic of institutional reform litigation: the problem of the speculative remedy, of the government defendant, and of the affected third party." *Id.* Likewise, such a standard allows the court to focus on the purpose behind the consent decree and to work toward effectuating that purpose. *Id.* at 1037–38.

24. The State has held the position since the beginning of the fight over modification of the consent decree in this case that the standard for modification of consent decrees set forth in *Swift, supra,* should apply and that under that standard no modification should be ordered. In its most recent memorandum on the issue of modification, the State cites to a recent Fifth Circuit opinion, *Walker v. United States Department of Housing and Urban Development,* 912 F.2d 819 (5th Cir.1990), for the proposition that the modification should not be granted in the present case. The Court finds the facts in the *Walker* case distinguishable from the facts in the present case and notes that in any event this Court is not bound by Fifth Circuit precedent but instead is bound by Sixth Circuit precedent which the Court finds allows for a modification of the Consent Decree in the present case.

In *Walker, supra,* a consent decree was entered into in a housing discrimination case. *Id.* at 822. As part of the consent decree, the Dallas Housing Authority ("DHA"), a defendant in the lawsuit, was to submit a plan to the United States Department of Housing and Urban Development ("HUD") for the revitalization of a Dallas housing project. A plan was submitted by DHA which was approved by HUD. Additionally, HUD pledged sufficient federal resources to provide 1,000 units of additional housing under the revitalization plan, apart from 800–900 units which were to be modernized. The district court then approved the revitalization plan. Subsequently, HUD announced to DHA without obtaining prior court approval that it would drastically reduce its subsidization of the project. A motion to enforce or modify the consent decree to restore past levels of HUD subsidization was then filed and the district court ordered HUD to pay $1.8 million to DHA, representing the aggregate loss to DHA in federal funding. *Id.* at 822–823. HUD then filed an appeal in which it argued that the consent decree contains no binding agreement between DHA and HUD regarding funding and that the remedy imposed by the district court was beyond the scope of the instrument.

The Fifth Circuit found that it was improper for the district court to order HUD to make a financial contribution since the "court-ordered subsidization is not authorized by the consent decree's plain language." *Id.* at 826. The Fifth Circuit further found that "[s]ince we cannot conclude that the consent decree, as confined by its plain language, has been frustrated as a consequence of reduced subsidies, we remand the case for the district court's more informed view on this matter." *Id.* at 827.

In the *Walker* case, HUD had never specifically promised to make contributions toward the demolition of housing units; rather, HUD had indicated that it would consider request from the DHA for demolition funds. The Fifth Circuit found that the district court made an improper and strained interpretation of the consent decree when it found that HUD was obligated to make funding available.

In the present case, the State clearly agreed to make a financial contribution to the Lorain desegregation plan. Granted, the Consent Decree provides for a $1 million cap on the State's contribution. However, the Court has made extensive fact findings which support the Court's conclusion that modification is warranted in the present case with respect to the amount of the State's contribution. This is not a case as in *Walker* where the Court is attempt-

B. *Application of the Law to the Facts of the Present Case.*

 The Court finds, for the reasons set forth in this section, that a modification of the consent decree to increase the State's contribution is warranted. The extensive evidence which the Court heard through the various hearings conducted on this matter has convinced the Court that the consent decree should be modified since a better appreciation of the facts in light of experience indicates that the decree in terms of the State's contribution to the desegregation plan in Lorain is not properly adapted to accomplish its purpose. *Heath,* 888 F.2d at 1108 (citations omitted).

As the Court indicated in its findings of fact above, the amount of money which the parties envisioned would be adequate to fund the desegregation program in Lorain was wholly unrealistic. Lorain has implemented a successful desegregation program through the use of magnet schools. Experience has shown that the desegregation of the Lorain City Schools has been much more expensive than was originally contemplated. The increase in cost was due in large part to the fact that the par-

ties did not have an accurate figure to work with as to the true number of students that would have to be moved to achieve desegregation. Likewise, the parties did not take into account the costs associated with the development and expansion of a bilingual program in the Lorain City School District which is an integral component of the desegregation of the Lorain City School District.[25]

The terms of the decree are no longer equitable in the Court's view. The State has spent a considerable amount of time and money trying to persuade the Court that the reason Lorain cannot fund its magnet school desegregation program is due to Lorain's own unwarranted expansion of the program beyond that necessary to achieve desegregation and due to Lorain's fiscal mismanagement. The Court was not, however, persuaded that Lorain is unable to fund its desegregation program for reasons all its own. Rather, the Court is persuaded that experience has shown the desegregation program is larger and more costly than it was originally thought it would be.[26] This is not the fault of Lorain

---

ing to argue that the language of the Consent Decree provides for State Funding beyond the $1 million cap. The Court acknowledges that the Consent Decree as it now stands does not provide for additional state funding. However, the Court finds, for the reasons set forth with specificity below, that a modification is warranted under the standard set forth by the Sixth Circuit in *Heath, supra.*

25. The Court notes that it considers the costs of the bilingual program in Lorain as costs of the desegregation plan in Lorain since the Court finds that adequate bilingual education is an important component of the Consent Decree in this case. At the hearing on this matter the State elicited testimony to the effect that the State only agreed under the terms of the Consent Decree to contribute 50% of the costs of the evaluation of the bilingual program then in place in Lorain but did not agree to share in the costs of developing and implementing an effective bilingual program in the Lorain City School District.

The Court agrees that the language in the Consent Decree with respect to this point is somewhat misleading. However, it is the Court's view, having construed the entire Consent Decree in light of the purpose behind the Decree, that the State's share was to include the costs of the bilingual program in Lorain and not just the costs of the evaluation of the bilingual

program. In Paragraph 4 of the Consent Decree the State agreed to pay "50 percent of the expenses incurred by the Lorain City School District in designing, implementing, administering and maintaining educationally sound programs reasonably expected to reduce racial isolation ..." Consent Decree, Docket No. 76 at 4. Intricately bound up with the need to eliminate racial isolation in the Lorain schools is the need to maintain quality bilingual education in order to effectively mainstream students with special language needs. The State's agreement to pay 50 percent of the expenses incurred toward achieving the goals set forth in the goal statement thus encompasses the costs of the bilingual program since it is a part of the overall costs of desegregation of the Lorain City School District. The specific statement that the State will contribute 50 percent toward the costs of the evaluation must be read in light of the State's agreement to contribute 50 percent toward the costs of the overall desegregation program which, the Court found above, clearly includes within its ambit the development and implementation of an effective bilingual program.

26. The Court notes that it has asked Lorain to separate out the costs of the non-court ordered magnets. The Court will not require the State to pay any of the costs of the non-court ordered

for going beyond the scope of the plan. Instead, the premise upon which the financial portion of the decree was based was faulty.

Likewise, the Court was not persuaded by the State's arguments that Lorain has mismanaged its finances by overextending itself in terms of salaries and fringe benefits. The Court finds that Lorain should not be penalized for trying methods such as the ERI and salary increases in order to open positions for minorities and to lower salaries in the long term. Lorain can never hope to reach the hiring goals in the Consent Decree unless it can offer competitive salaries and free up otherwise occupied positions.

The Court finds that in order to effectuate the purpose of the Consent Decree, the Decree should be modified to the effect of an increase in the State's contribution to the Lorain desegregation program. In the next section of its Opinion, the Court sets forth the amount that the State will be required to pay.

## VII. REMEDY.

### A. *The Monetary Award for 1989–90.*

The Court turns now to a determination of the amount of additional funding that defendant the Ohio Department of Edu-

cation shall be required to provide to Lorain to carry out the financing of the desegregation plan for the Lorain City School District. Initially, the Court finds that it is improper to require the State to contribute toward the costs of desegregation into the future on a continuing basis. That is, the Court is of the view that at some point Lorain must absorb the costs of its magnet and bilingual programs into its general costs of operating the school district.[27] Moreover, as Lorain continues in its quest to meet the hiring goals, it moves toward the day when it will be permitted to be relieved of the continuing supervision of this Court. An open-ended obligation imposed on the State to continue to fund in some measure the costs of desegregating the Lorain schools would have the potential of removing Lorain's incentive to meet the hiring goals and thus meet all of its obligations under the Consent Decree. Accordingly, the Court's order regarding an increased State contribution will provide for a gradual decrease and eventual discontinuance of the State's contribution to the Lorain desegregation plan.

The Court orders that the State pay to Lorain the sum of $2,600,917.00 as 50% of the desegregation costs [28] for the 1989–1990 school year.[29]

---

magnets as they are not costs of implementing the desegregation plan but rather are costs Lorain voluntarily assumed.

**27.** There was much questioning at the evidentiary hearings on this matter with regard to when a school district should absorb the costs of desegregation programs. Specific to the situation in Lorain, several witnesses were asked when the State's obligation to assist with Lorain's desegregation program will end. It is the Court's view that the State should not be required to contribute to the desegregation plan into the future indefinitely. That is, the Court believes that there is a point in time when Lorain should bare the responsibility for its magnet school program.

However, the Court is also of the view that Lorain should have been provided with more State funding initially to start the programs up and to run them for several years until it was viable for Lorain to assume full financial responsibility for the programs. To the extent that Lorain was not provided with sufficient initial funding, it has not been able to assume full financial responsibility for the programs.

**28.** Desegregation costs include the costs of the bilingual program.

**29.** The Court anticipates that either the State or Lorain or both may appeal the Court's Order. In the interim, the Court is concerned about the fiscal welfare of the Lorain school system and the potential negative impact non-payment by the State pending appeal could have on the welfare of the Lorain school system and the implementation of the desegregation plan. Accordingly, the Court suggests that the State and Lorain should consider entering into an agreement calling for the immediate payment of the $2,600,917.00 herein ordered to be paid with the understanding that neither party would forego its right to prosecute an appeal from this Order and with the additional understanding that if the appeal results in a ruling that this Court erred in requiring the State to pay the additional monies, that the State would be reimbursed through subsequent deductions over a stated period of years from the monies due Lorain through the State Foundation Program. Such an agreement would enable Lorain to engage in better long-range fiscal planning and would

### B. The Monetary Award for School Years 1990–1991, 1991–1992, 1992–1993, & 1993–1994.

The Court orders the State to pay 40% of the Lorain desegregation costs for school year 1990–1991. The Court further orders the State to pay 30% of the desegregation costs for the 1991–1992 school year; 20% of the desegregation costs for the 1992–1993 school year, and 10% of the desegregation costs for the 1993–1994 school year.[30] The State shall no longer have a duty to contribute financially to the Lorain desegregation program following the 1993–1994 school year.[31]

Lorain is granted leave to file for its award of the 40% allowance for the desegregation costs of the school year 1990–1991 as soon as it has its final figures. The motion shall be accompanied by a detailed accounting and be served on the State's counsel of record. The State shall have thirty days to file objections in the event the State elects to challenge the accounting. A similar practice shall apply to the three remaining years of 1991–1992, 1992–1993, and 1993–1994.

### C. Interest on the Award.

The monetary award payable by the State to Lorain for the school year 1989–1990 in the sum of $2,600,917.00 shall bear interest at the rate prescribed by law from the date of the judgment unless the State pays the principal amount of the judgment within sixty days of the date the Judgment Entry is filed. A similar interest award shall be granted as to the remaining years with the proviso that no interest will be payable if the principal amount is paid within sixty days of the Judgment Entry.

### D. Attorney Fees.

Counsel for the plaintiffs and counsel for CHIP are each entitled to attorney fees for the time devoted to the hearings required by Lorain's motion for a modification of the Consent Decree. The Court finds that the attorney fees for the work done in 1990 shall be paid on a 50/50 basis by Lorain and the State. However, the Court is of the preliminary view that the attorney fees to which plaintiffs' and CHIP's counsel are entitled to for 1991 shall be paid entirely by the State in view of the State's decision not to negotiate a resolution of the dispute between Lorain and the State following the Court's Order of August 17, 1990 (Docket No. 338). Under the circumstances, the Court is of the view that it would be inequitable to require Lorain to pay half of the fees of plaintiffs' and CHIP's counsel for their work required by the extensive evidentiary hearings conducted in 1991.

Counsel for plaintiffs and counsel for CHIP are instructed to submit a detailed application for attorney's fees to the Court as soon as practicable.

### VIII. CONCLUSION.

For the reasons set forth above, the motion of defendant Lorain Board of Education for a modification of the Consent

---

likewise enable Lorain to advise its constituents on whose support it relies for additional funding as to the short-range and possible long-range consequences of this Court's Order.

**30.** As a final gesture toward getting the parties to consider a settlement of the controversy, the Court suggests that the parties might reach an agreement on a fixed sum of money to constitute 40%, 30%, 20% and 10% of the desegregation costs for the four school years beginning with school year 1990–1991 and further agree on a schedule of payments for each of the four years thus eliminating the probability of additional litigation over a determination of the exact amount of Lorain's costs in the implementation of the desegregation plan for each of the four remaining years.

**31.** The total contribution of the State required by this decision will depend on Lorain's continuing cost in implementing the desegregation order. However, it appears likely that the overall cost of the State's contribution to the Lorain desegregation program will be approximately $9,000,000.00. The Court believes that sum to be reasonable for the reasons set forth in its Opinion. Moreover, by way of comparison with the State's contribution to the implementation of the Cincinnati desegregation order, the Court observes that the student population in Cincinnati, approximately 51,110, is about four times that of Lorain at 12,300, and the State's $35,000,000.00 contribution to the Cincinnati desegregation program is approximately four times that of the anticipated State contribution to Lorain using the estimated sum of $9,000,000.00.

Decree to provide that the State contribute additional monies toward the financing of the desegregation plan in place in the Lorain City School District is granted.

IT IS SO ORDERED.